IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

Case No: _____

JOSEPH "JOEY" S. WATKINS,

      Plaintiff,

vs.

FLOYD COUNTY, GEORGIA; MARK
SHAWN SUTTON, as the Administrator of
the Estate of STANLEY E. SUTTON; PERRY
MAYNARD, in his Individual Capacity;
TOMMY SHIFLETT, in his Individual
Capacity; BILL SHIFLETT, in his Individual
Capacity; JAMES R. GARMON, in his
Individual Capacity; and FRANCIS "JAY"
JARVIS, in his Individual Capacity,

      Defendants.

COMPLAINT
(Jury Trial Demanded)

Plaintiff Joseph "Joey" S. Watkins, by and through his attorneys with the

law firm Pfeiffer Rudolf, hereby complains of Defendants and alleges as follows:

**<u>INTRODUCTION</u>**

*"I am not a murderer...I will be back in court because I am not guilty
of this. They can send me to prison, but I just want the family to know
that justice has not been done. I had nothing to do with this, and I
will say it till the day I die."*

    *Joey Watkins's Post-Verdict Statement to the Court, July 1, 2001*

1.    Decades after proclaiming his innocence and promising to return to

court to prove it, Joey Watkins was finally exonerated. When his charges were

dismissed in September 2023, Watkins had spent more than 22 years incarcerated in the prisons of Georgia for a murder he did not commit.

2.    To convict Watkins for a crime he did not commit, investigators with the Floyd County Police Department ("FCPD") set upon a course of character assassination to manufacture a case against Watkins after he had been cleared in a fulsome investigation by Detective Jim Moser ("Moser") of the Rome Police Department ("RPD").

3.    The "evidence" used to secure Watkins's arrest and conviction was fabricated by FCPD investigators.

4.    FCPD investigators knowingly used false statements by witnesses, many of whom were jailhouse informants recruited by FCPD investigators, to procure Watkins's arrest and his conviction.

5.    FCPD investigators and agents of the Georgia Bureau of Investigation ("GBI") wrongfully concealed reports, notes, and other materials that demonstrated Watkins's innocence.

6.    A GBI examiner likewise concealed exculpatory information from the District Attorney that he and FCPD investigators were duty-bound to disclose in accordance with *Brady v. Maryland*, 373 U.S. 83 (1963), and testified falsely at trial.

7.    These Defendants' conduct was intentional and/or done with reckless disregard for the constitutional rights of Joey Watkins.

8. Following his conviction, Watkins and those acting on his behalf repeatedly attempted to establish his innocence through post-conviction proceedings, but Defendants willfully obstructed those efforts and continued to conceal both the truth and the exculpatory evidence.

9. Watkins languished in prison because Defendants caused his wrongful conviction and thereafter obstructed his efforts to obtain a fair hearing of his innocence claim. He suffered physical injuries in prison and lost two decades of his life due to the Defendants' misconduct.

10. By the time he was set free, Watkins's parents were shells of their former selves. Both were and remain in declining health and are broken financially after years of championing their son's cause and paying tens of thousands of dollars in attorneys' fees in efforts to prove their son's innocence and wrongful conviction.

11. For more than two decades, Joey Watkins was deprived of his free will and the right to live a life of his own making. Each day was controlled by others. He was told when to wake up and go to bed, when and what he could eat, when he could shower, and when he could exercise or enjoy fresh air. Watkins lost friends and family members while incarcerated. He was not allowed to comfort them during their times of need and was forced to grieve alone in a prison cell.

12.     Throughout his wrongful incarceration, Watkins was subjected to inadequate nutrition and medical care and lived amid the constant threat of prison violence at some of the worst prisons in Georgia. He suffered a broken nose and broken front tooth in early 2002, while housed at Phillips State Prison, when a group of prisoners tried to take his belongings. They beat Watkins when he resisted.

13.     Watkins sustained other serious injuries during prison altercations, including a severe hernia in late 2005. Due to the state of the prison medical system, Watkins had to live with the excruciating pain and persistent discomfort from that hernia until he was finally allowed to have surgery in 2016.

14.     Throughout his wrongful incarceration, Watkins was singled out for additional, unjustified punishment, including long stints in solitary confinement in 2012 and 2018.

15.     Joey Watkins's more than 22 years of wrongful imprisonment were the result of the named individual Defendants' wrongful and unconstitutional acts and the Floyd County Police Department's failure to adequately train and supervise its officers.

16.     Joey Watkins brings this action against Defendants seeking monetary damages pursuant to 42 U.S.C. § 1983 for depriving him of his liberty without due

process of law and in violation of the rights guaranteed him by the Fourth and Fourteenth Amendments to the United States Constitution.

## PARTIES

17.    Joey Watkins is a citizen and resident of the State of Georgia. He resides in Silver Creek, Georgia, which is situated within the Northern District of Georgia.

18.    Defendant Floyd County is a municipal corporation organized under the laws of the State of Georgia. The Floyd County Police Department ("FCPD") is, and was at all times pertinent to this action, a department of Defendant Floyd County. Upon information and belief, Floyd County has purchased and maintained applicable policies of liability insurance and has thereby waived governmental immunity that might otherwise be available to Floyd County and its personnel and officials, including but not limited to those employed with the FCPD.

19.    Upon information and belief, Stanley E. Sutton, Sr. ("Sutton") died on August 26, 2023, and, upon information and belief, an estate was opened on his behalf. Plaintiff, upon information and belief, alleges that Mark Shawn Sutton was duly appointed as Administrator of the Estate of Stanley E. Sutton, Sr., and is thus in his representative capacity as Administrator of the Sutton Estate. At all relevant times, Sutton was employed as a police officer and investigator with the FCPD and

was acting under color of law and within the scope of his employment with Floyd County and the FCPD.

20.    Perry Maynard ("Maynard") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, Maynard was employed as a police officer and evidence technician with the FCPD and was acting under color of state law and within the scope of his employment with Floyd County and the FCPD. Maynard is sued in his individual capacity.

21.    Tommy Shiflett ("T. Shiflett") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, T. Shiflett was employed as a police officer and investigator with the FCPD and was acting under color of state law and within the scope of his employment with Floyd County and the FCPD. T. Shiflett is sued in his individual capacity.

22.    Bill Shiflett ("B. Shiflett") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, B. Shiflett was employed as a police officer and investigator with the FCPD and was acting under color of state law and within the scope of his employment with Floyd County and the FCPD. B. Shiflett is sued in his individual capacity.

23.    James R. Garmon ("Garmon") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, Garmon was employed as a special agent with the Georgia Bureau of Investigation ("GBI")

and was acting under color of state law and within the scope of his employment with the GBI. Garmon is sued in his individual capacity.

24.    Francis "Jay" Jarvis ("Jarvis") is, upon information and belief, a citizen and resident of Georgia. At all times relevant to the Complaint, Jarvis was employed as a forensics specialist with the GBI and was acting under color of state law and within the scope of his employment with the GBI. Jarvis is sued in his individual capacity.

## **JURISDICTION AND VENUE**

25.    Plaintiff brings this action under 42 U.S.C. § 1983 for acts committed by Defendants under color of state law which deprived him of liberty without due process of law, in violation of his rights under the United States Constitution.

26.    This action arises under the Constitution and laws of the United States. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3). This Court has pendent jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a) because they are part of the same case and controversy described by Plaintiff's federal claims.

27.    Pursuant to 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Northern District of Georgia as a substantial part of the events or omissions giving rise to the claims at issue in this matter occurred in this District.

28.    On September 21, 2023, the criminal case against Plaintiff was dismissed by the Floyd County District Attorney's Office ("DA's Office"). Plaintiff's civil rights claims, as alleged herein, accrued on September 21, 2023, at the point in time when he was removed from criminal jeopardy pursuant to the DA's Office's Motion for Nolle Prosequi and the granting of same by Order of the same date, and are thus timely filed. *McDonough v. Smith*, 508 US 109 (2019); *Heck v. Humphrey*, 512 U.S. 477 (1994).

## FACTS

29.    This wrongful conviction and imprisonment case arises from the highway death of a 20-year-old named Isaac Dawkins ("Dawkins") in January 2000. Dawkins was shot while driving at about 7:18 p.m. on January 11, 2000.[1] He was pronounced dead at 12:55 p.m. on January 12, 2000.

30.    Dawkins was killed by a single gunshot to the right back side of his head. At the time he was shot, Dawkins was driving northbound on Highway 27 within the city limits of Rome, Georgia.

31.    It was not initially known that Dawkins had been shot. Witnesses to his wreck and even first responders thought that he had been involved in a single-vehicle accident and may have fallen asleep at the wheel.

---

[1] The first 911 call came in at 7:19 p.m., so 7:18 p.m. is the latest time that Dawkins could have been shot.

32.    The first 911 call was made by Wayne Benson ("Benson") at 7:19 p.m. on January 11, 2000. Benson saw Dawkins's truck interacting with a blue Honda, and then suddenly veer off the highway, crossing the median and the opposite lanes of traffic, before coming to rest near a stand of trees.

33.    First responders were on scene in minutes and Dawkins was rushed to Floyd Medical Center by ambulance. Because the wreck occurred within the city limits of Rome, Georgia, the Rome Police Department ("RPD") was the law enforcement agency in charge of the scene.

34.    RPD Detective Jim Moser ("Moser") met with the Dawkins family at Floyd Medical Center. Shortly after 9:00 p.m. that evening, Moser learned from medical staff that a CAT scan revealed a bullet lodged in Dawkins's skull.

### The Initial Investigation Clears Joey Watkins

35.    Upon learning that Dawkins had been shot, Moser advised on-scene law enforcement to treat the wreck site as a crime scene. Moser was placed in charge of the criminal investigation. He quickly learned the shot that killed Dawkins was from a 9mm handgun and had been fired through the back window of Dawkins's Toyota pickup truck.

36.    Moser promptly interviewed witnesses to the wreck. Wayne Benson had been travelling behind Dawkins's pickup truck and reported seeing an extended interaction between Dawkins's truck and an older-model, blue Honda.

Benson told Moser that the small blue Honda had darted in front of Dawkins's truck, causing Dawkins to slam on his brakes, then the two vehicles drove erratically together until Dawkins's truck left the roadway. Benson reported first seeing the interaction between the two vehicles about a half-mile north of Floyd College.

37.    Based on Benson's statement, Moser quickly determined the shots came from the blue Honda.

38.    During Moser's initial investigation, he learned that Dawkins had been involved in other road rage incidents, with Dawkins described as the aggressor.

39.    Moser also spoke with Dawkins's friends and family at the hospital, inquiring as to whether Dawkins had any enemies or if he'd had difficulties with anyone. One of the individuals with whom Moser spoke was Brianne Scarber, who had dated both Watkins and Dawkins.[2]

40.    Scarber told Moser that Watkins was someone with whom Dawkins had prior disagreements.

41.    Based upon what he learned in the initial stages of the investigation, Moser proceeded to investigate Watkins.

---

[2] Brianne Scarber's last name is spelled differently throughout the record in Watkins's criminal case, including as "Scarborough" and "Scarbrough." Upon information and belief, the correct spelling of her last name is "Scarber."

42.    On January 14, 2000, Watkins was interviewed and told RPD investigators exactly where he'd been and what he'd done on the evening Dawkins was shot. His account was corroborated by independent witnesses and cell phone data which proved he could not have shot Dawkins or been in the blue Honda. Watkins also truthfully denied owning or having access to a 9mm weapon.

43.    For six weeks thereafter, RPD Detective Moser meticulously fact-checked Watkins's alibi and ran down every rumor or story presented to him that was in any manner related to Watkins's possible motive to shoot Dawkins, any existing or past animosity between Dawkins and Watkins, or Watkins's alleged "bad acts" involving others.

44.    Moser also gathered cell tower records and cell phone call records and timed and measured the distance between the location of Watkins's cell phone around the time of the shooting and the crime scene. Moser created reports of this investigation, which proved it impossible for Watkins to have shot Dawkins or been in the blue Honda.

45.    As a result of his investigation, Moser eliminated Watkins as a suspect.

### Moser Investigates Alternative Suspect Heath Wilson

46.    Moser further learned that on the same night Dawkins was shot, another driver called 911 and reported a blue Honda that was speeding, weaving

in and out of traffic, and driving aggressively. Moser identified the driver as Heath Wilson, a young man with substance abuse issues who drove a 1986 blue Honda.

47.    Moser discovered that Wilson had fired a 9mm pistol at another vehicle during a road rage incident the very same night of the Dawkins shooting. The target of that incident was a man named David McDaniel, who reported the incident to police after his truck was shot with a 9mm. On January 15, 2000, Wilson was arrested in connection with the road rage incident involving McDaniel.

48.    While Moser continued to investigate Wilson for the Dawkins shooting, the Dawkins family was growing frustrated with the lack of an arrest in their son's murder.

49.    The Dawkins family's frustration apparently came to a head in late February 2000, when Dawkins's father Sammy visited his son's grave and reported finding flies swarming the grave, with a dog carcass nearby. That same weekend, Sammy Dawkins told a friend of his, Captain Houston Freeman ("Freeman") of the Floyd County Police Department, about finding the dead dog near his son's grave and shared his concerns that Moser and RPD were not conducting a satisfactory investigation.

50.    False evidence related to this dog would prove to be pivotal to both the wrongful conviction of Watkins and the unjustified delays which accompanied Watkins's quest to prove his innocence.

**FCPD's Stanley Sutton Assumes Control of the Investigation**

51.     As a result of the weekend conversation between Sammy Dawkins and Freeman, FCPD investigator Stanley Sutton was placed in charge of the Dawkins murder investigation.

52.     Relegated to a side role, Moser contacted the Georgia Bureau of Investigation on March 7, 2000, to assist in the investigation into the Dawkins shooting. Moser provided his reports, including the results of his investigation into Watkins's cell phone records, to the GBI. James Garmon was assigned to coordinate and supervise the GBI's involvement in the investigation.

53.     While Sutton served as the lead detective, he worked closely on the investigation with two fellow FCPD investigators: Tommy Shiflett and Bill Shiflett. All three FCPD investigators worked on Dawkins's murder investigation. All three FCPD investigators had knowledge of each other's actions throughout the investigation.

54.     FCPD Investigator Sutton performed only a cursory review of the evidence pointing to Heath Wilson as a viable suspect in the Dawkins shooting. Sutton interviewed Wilson and asked if he knew Dawkins and if he shot at him. Wilson denied involvement. No further investigation of Wilson was conducted by Sutton.

55.    Sutton focused his attention on Joey Watkins, despite Moser's investigation ruling him out as a suspect. Upon information and belief, Sutton harbored ill will against Watkins from the time Watkins was an adolescent.

56.    One of the first steps that Sutton took was to place reward posters in the Floyd County Jail. Upon information and belief, Defendants Sutton, T. Shiflett, B. Shiflett, and the FCPD leadership knew that such tactics often resulted in false accounts being offered by incentivized detainees.

57.    Upon information and belief, in spite of this knowledge and as a matter of routine practice, FCPD investigators used information put forth by detainees in criminal prosecutions with knowledge that the information was fabricated and false.

58.    These investigators preyed on vulnerable members of the community over whom they could assert pressure and leverage. They enticed and coerced false statements to be used in the prosecution of Watkins.

### Sutton and FCPD Investigators Manufacture a Narrative Involving Watkins Using Jailhouse Informants

59.    Defendant Sutton and the FCPD investigators knew that any theory of the crime that involved Watkins acting alone was inconsistent with incontrovertible phone records. At the very time the fatal shot was fired — no later than 7:18 p.m. based on the FCPD 911 records—cell phone records confirmed Watkins was talking to his girlfriend on his handheld phone.

14

60.    The FCPD investigators realized that it would have been impossible for Watkins, while driving his car and using his handheld cell phone, to kill Dawkins with a single shot to the back of his head through the rear window of his truck. Upon information and belief, therefore, Defendants Sutton, T. Shiflett, and B. Shiflett concocted a theory in which Watkins had enlisted an accomplice to help him hunt down and kill Dawkins.

61.    Looking for evidence to support their theory, Sutton and the other FCPD defendants placed flyers in the Floyd County Jail seeking information about the Dawkins murder.

62.    After posting these flyers, Sutton and the other FCPD defendants began receiving information from detainees at the jail who were facing various charges.

63.    Upon information and belief, when speaking to these detainees, Sutton and the other FCPD defendants provided details about the crime and the investigation to them. As a result of this misconduct, Sutton and the other FCPD defendants procured false and fabricated statements from detainees at the jail:

> (a) Joey Samples: Samples met with Sutton and B. Shiflett at the jail immediately after the flyers were posted. Upon information and belief, the investigators provided Samples with details about the Dawkins shooting and their investigation. Samples then told the investigators that Mark Free, who was detained with Samples, had allegedly made vague statements to Samples suggesting (but not admitting) he was involved in Dawkins's murder, but Samples could not remember the details of these alleged statements.

(b) Winford Ellis: FCPD investigators procured a false statement from Ellis that Watkins purportedly told him that police were dragging the wrong lake for the murder weapon.

(c) Corey Jacobs: After Sutton told him details about the case, Jacobs—who was also Sutton's nephew—falsely claimed he heard Watkins brag about shooting Dawkins.

(d) Barry Mullinax: FCPD investigators coerced a false statement from Mullinax, who had been in a jail diversion center with Mark Free, that he was driving behind Watkins on the night of Dawkins's murder and had seen Watkins fire a weapon at Dawkins's truck. The FCPD defendants knew Mullinax's statement was false because Wayne Benson, the independent witness who called 911, said there were no cars between him, Dawkins's truck, and the blue Honda involved in the interaction.

64. Defendants Sutton, T. Shiflett, and B. Shiflett knew, or reasonably should have known, that the statements proffered by these witnesses were false. Nonetheless, these Defendants knowingly and/or recklessly made use of these witnesses' false statements in the prosecution of Watkins.

65. Upon information and belief, these Defendants concealed additional impeachment evidence about these witnesses in their investigator notes.

66. The FCPD was aware of Sutton's practice of targeting jailhouse informants and engaging in coercive conduct to convince those informants to tell him what he wanted to hear.

67. In 1989, Sutton was suspended by the FCPD for 15 days and placed on 6 months' probation after he threatened a jailhouse informant with his gun. The disciplinary report stated that the jailhouse informant had previously provided

"information" to Sutton in several criminal cases, and that Sutton had engaged in "similar" behavior on at least two other occasions, one of those times being inside the jail.

### FCPD Investigators Prove Their Manufactured Case Against Watkins is Impossible

68.    The incontrovertible phone records presented another problem for Sutton and the other FCPD investigators: they proved it was impossible for Watkins to have been in the blue Honda from which shots were fired at Isaac Dawkins.

69.    FCPD investigators were aware of and had possession of RPD Detective Moser's report proving this impossibility after Moser conducted an investigation of the cell tower evidence and distances between the relevant locations.

70.    Despite Moser's report, Sutton and T. Shiflett conducted their own investigation to explore whether there was any way they could theoretically place Watkins in the blue Honda from which shots were fired.

71.    To do so, Sutton and T. Shiflett, with the knowledge and assent of B. Shiflett, drove a car with a cell phone to investigate which tower the cell phone would connect to at various points in time during the drive, while timing the drive itself.

72.     Watkins's cell phone connected with the Kingston Tower at 7:15 p.m. on January 11, 2000, when he made a call to his girlfriend Aislynn.

73.     This connection meant that Watkins was miles away from the area just north of Floyd College where an eyewitness saw Dawkins interacting with the blue Honda no more than one minute later at 7:16 p.m.[3]

74.     It also meant that Watkins could not have been in the blue Honda when Dawkins was shot no later than at 7:18 p.m.

75.     Based upon this investigation, Defendants Sutton, T. Shiflett, and B. Shiflett determined—just as Moser did—that it was physically impossible for Watkins to have shot Dawkins or to have been in the blue Honda.

76.     In summary, these FCPD investigators disproved their own theory of what occurred on January 11, 2000.

77.     Upon information and belief, this investigation of cell tower records, cell phone records, and 911 calls also showed that Heath Wilson could have been at the scene of Dawkins's shooting at 7:18 p.m. This evidence both inculpated Wilson and exculpated Watkins.

---

[3] Wayne Benson testified at trial that he saw Dawkins interacting with the blue Honda for at least two minutes. Given that Dawkins was shot at 7:18 p.m. at the latest, this testimony means that Dawkins began interacting with the blue Honda no later than 7:16 p.m.

78.    Sutton provided the results of this investigation to GBI Agent Garmon.

79.    This proof, created by the FCPD detectives themselves, would have been powerful exculpatory evidence at Watkins's trial. However, FCPD investigators Sutton, T. Shiflett, and B. Shiflett, and GBI Agent Garmon, intentionally and/or recklessly concealed this evidence from the DA's Office.

80.    FCPD investigators continued to conceal this evidence through Watkins's appeal and post-conviction efforts. No documentation related to this exculpatory evidence is contained within the FCPD investigative file for the case. Thus, during post-conviction efforts, multiple Open Records Act requests ("ORARs") to Floyd County and the FCPD produced no notes or documentation related to the exculpatory evidence.

81.    A separate ORAR, however, submitted to the GBI in 2014 by the Georgia Innocence Project ("GIP") during its work on Watkins's case finally uncovered this exculpatory evidence. In response to the GIP's ORAR, the GBI produced a note written by Garmon, dated April 3, 2000, which reads as follows:

> Investigator Sutton stated that Captain Tommy Shiflett of the Floyd County Police Department, using a cellular phone, had made several test calls starting at the residence of Joey Watkins, and traveling to the crime scene where Isaac Dawkins was shot. Investigator Sutton stated that the calls were linked to several different cellular towers in the Rome/Floyd County area, some overlapping, and would furnish a copy of his report upon receipt.

82.     This note documenting the investigation that Sutton, T. Shiflett, and B. Shiflett conducted—just as Moser did—was not turned over to the prosecution. Therefore, the evidence that this investigation into the cell towers and distances between relevant locations was even conducted was concealed from Watkins's attorneys.

83.     Because the results of this investigation were inconsistent with Watkins's guilt and in fact disproved the FCPD investigators' theory of a crime, Garmon, Sutton, T. Shiflett, and B. Shiflett, in bad faith, ensured that no record of it was kept in the GBI or FCPD investigative file that was provided to the DA's Office. As a result, the jury never heard evidence that the FCPD investigators had established that Watkins could not have shot Dawkins on the evening of January 11, 2000.

84.     It was the importance of this concealed evidence that ultimately led to Watkins's conviction being overturned.

### FCPD Investigators Acknowledge They Have No Evidence to Arrest Watkins

85.     On November 9, 2000, Defendant Sutton told Garmon that he and FCPD investigators were pursuing Watkins as a suspect, but "**no evidence has been obtained to lead to an arrest**."

### FCPD Investigators Coerce a False Statement from Josh Flemister

86.     Just two days later, on November 11, 2000, knowing they had nothing to support their theory that Watkins had anything to do with the shooting of Dawkins, FCPD investigators Sutton, T. Shiflett, and B. Shiflett traveled to a suburb of Richmond, Virginia, to secure a statement from Josh Flemister, a friend of Watkins. Flemister had substance abuse issues and was drunk and under the influence of drugs when investigators first contacted him. He did not know that the investigators were coming to see him before they arrived.

87.     The FCPD investigators took Flemister to a motel room they had rented and interrogated him. They played tapes of other witnesses' statements suggesting Flemister was involved in the shooting and threatened that, if he did not tell them what they wanted to hear, he would be arrested when he returned to Rome.

88.     Fearful, under duress, and impaired, Flemister provided a false statement to Sutton, T. Shiflett, and B. Shiflett, in which he claimed to have been wedged between Watkins and Free in Watkins's truck when Dawkins was shot.

89.     FCPD investigators knew Flemister was impaired at the time he gave his alleged statement.

90.     Investigators fed Flemister evidence to make his statement appear more credible. For example, when Flemister said he did not see the back window

of Dawkins's car break, T. Shiflett told him: "Now think hard, cause I believe you did. You may not remember it, but I believe you did."

91.    FCPD investigators knew or should have known that Flemister's statement was not true. His story did not match the known evidence: Flemister said Watkins was in his white truck as he chased Dawkins, even though all other evidence showed the shooter was in a blue Honda. He also falsely said that Dawkins's truck exited the roadway to the right, though investigators knew it veered to the left and crossed the opposing lanes of traffic.

92.    Once Flemister provided the investigators with his false statement, they finally let him leave their motel room.

## FCPD Investigators Arrest Watkins with False Evidence

93.    Having coerced a false statement from Flemister the day before, Sutton, T. Shiflett, and B. Shiflett met with the prosecutor on November 12, 2000, to seek approval for filing charges against Watkins. Upon information and belief, the investigators provided the prosecutor with Flemister's false statement and those from the jailhouse informants, without revealing that they knew those statements were false.

94.    The following day, on November 13, Sutton, with the knowledge, assent, and participation of fellow FCPD investigators T. Shiflett and B. Shiflett, had Watkins arrested on charges of murder and conspiracy to commit murder.

95.    No probable cause existed to justify the seizure, detention, or arrest of Watkins in connection with Dawkins's murder: FCPD investigators Sutton, T. Shiflett, and B. Shiflett knew or should have known that all purported "facts" and "evidence" they could cite were false and fabricated.

96.    No forensic or physical evidence tied Watkins to the murder of Dawkins.

97.    Cell phone data proved that Watkins could not have shot Dawkins nor could he have been in the blue Honda from which the shots originated.

98.     FCPD investigators Sutton, T. Shiflett, and B. Shiflett knew that Watkins could not have shot Dawkins because of their own investigation measuring the time and distance.

99.    The only "evidence" against Watkins consisted of false statements from biased "witnesses" and jailhouse snitches—statements that FCPD investigators Sutton, T. Shiflett, and B. Shiflett knew or should have known were untrue.

### Flemister Tells FCPD Investigators his Statement was False

100.    Two days after Watkins's arrest, Flemister returned to Rome and told FCPD investigators Sutton, T. Shiflett, and B. Shiflett that his story was not true and that he'd only said it because he was scared, intimidated, and under the

influence. Flemister denied any involvement in or knowledge of the Dawkins shooting.

101.    FCPD investigators threatened Flemister that he needed to stick to the false story he provided while in the motel room with the investigators.

### FCPD Investigators Seek Testing of the Dead Dog

102.    Around this same time, FCPD Investigators sent the dog carcass found near Isaac Dawkins's grave to the GBI for testing.

103.    Defendant Sutton requested that the bullet be removed from the dog's skull and compared to the bullet that killed Dawkins.

104.    The GBI determined that the bullet from the dog carcass was a .22 caliber and did not match the 9mm bullet used in the Dawkins' shooting. This evidence further exculpated Joey Watkins.

### FCPD Investigators Secure Watkins's Continued Detention and Indictments Based on False Evidence

105.    One month after Flemister recanted his statement, on December 14, Sutton testified at Watkins's probable cause hearing.

106.    In an attempt to show that there was probable cause to continue to detain Watkins, Sutton repeated the false statements that he had procured from Corey Jacobs, Joey Samples, Josh Flemister, and others.

107.    Sutton did not reveal that he knew these statements were false. He also did not reveal that Josh Flemister had recanted his statement.

108.    In his argument to the hearing judge, the prosecutor argued that Flemister's false statement was key to the finding of probable cause, describing it as the "most important" statement.

109.    The judge found that there was probable cause to continue Watkins's detention.

110.    Upon information and belief, Sutton's testimony was consistent with what he told the prosecutor to convince him to approve charges against Watkins. He therefore misled the prosecutor with falsehoods to instigate and continue criminal proceedings against Watkins.

111.    Watkins was indicted on January 26, 2001, based upon the same false and fabricated evidence cited as grounds upon which to arrest him on November 13, 2000.

### Exculpatory Evidence is Concealed from Watkins's Trial Counsel

112.    Watkins's case went to trial in Floyd County Superior Court in June 2001. Watkins was represented by Rex Abernathy, an experienced criminal defense attorney with the widely respected law firm of Cook & Connelly. He was assisted by another experienced attorney, Bill O'Dell.

113.    In the lead-up to trial, Abernathy and O'Dell sought and obtained disclosure of the prosecutor's file in accordance with the prosecutor's policy of "open file" discovery. Both defense lawyers specifically sought any exculpatory or

impeachment evidence provided to the DA's Office by FCPD investigators and the GBI, subject to *Brady v. Maryland*, 373 U.S. 83 (1963).

114.    Upon information and belief, it was common knowledge among law enforcement that the Floyd County DA's Office followed an "open file" discovery policy, and that any evidence provided to the DA would be given to Watkins defense counsel.

115.    Sutton, B. Shifflett, T. Shiflett, and the GBI therefore concealed from the DA's Office the exculpatory and impeachment evidence that was in their possession.

116.    The FCPD and GBI Defendants' concealment of the exculpatory and/or impeachment evidence included, but was not limited to:

(a) Notes, records, and other materials documenting Sutton, T. Shiflett, and B. Shifflett's investigation into the distances and travel times between the relevant locations;

(b) Notes, records, and other materials documenting Detective Moser's investigation into the distances and travel times between the relevant locations;

(c) Notes, records, and other materials that impeached the false statements procured from jailhouse informants; and

(d) Notes, records, and other materials evidencing their request that the GBI extract the bullet found in the head of the dead dog near Dawkins's grave and compare it to the bullet that killed Dawkins.

117.    Upon information and belief, the GBI Defendants and FCPD investigators Sutton, T. Shiflett, and B. Shiflett intentionally excluded their

investigator notes from the investigative file that was made available to the DA's Office.

### The False Evidence Regarding the Shooting of a Dog is Admitted at Watkins's Trial

118.     Just days before Watkins's trial was to begin, ADA Tami Colston provided notice that the State intended to introduce evidence about the dog carcass found by Sammy Dawkins near his son's grave in February 2000, claiming it had been shot by Watkins.

119.     Upon information and belief, Colston sought to introduce this evidence after being misled by FCPD investigators, who falsely claimed that Watkins had previously shot a dog owned by the Dawkins family in 1999.

120.     Based on this falsehood, Colston argued that the dog carcass found near Isaac Dawkins's grave was relevant evidence as Watkins's "signature."

121.     The evidence was allowed based on the trial judge's determination that the evidence tended to show that the murder of Dawkins was "personal rather than impersonal."

122.     It was this evidence that prosecutor Colston seized upon in closing argument to inflame the jurors' emotions against Watkins:

> What happened to that dog? Executed. Shot right between the eyes and laid on the grave of Isaac Dawkins. A signature. A signature. A calling card. What kind of hatred does that take? What kind of mind does that take?

123.    Watkins's defense attorneys noted the look of disgust on jurors' faces and the judgment in their eyes when looking at Watkins during this portion of the closing. Jurors were unaware that the GBI had concealed evidence establishing the dog carcass had nothing to do with Dawkins's death.

### GBI Forensic Specialist Jay Jarvis Misleads the District Attorney

124.    As noted above, as a part of his investigation, Sutton had requested that the bullet be removed from the dog's skull and compared to the bullet that killed Dawkins. The GBI determined that the bullet from the dog carcass was a .22 caliber. It was not a 9mm, the type of bullet that killed Dawkins.

125.    After that determination was made, FCPD evidence technician Perry Maynard received a "projectile and fragments" from the GBI on August 30, 2001. This evidence was not turned over to the DA.

126.    The FCPD and GBI defendants concealed from DA Colston that the bullet was removed from the dog carcass and that the bullet did not match the caliber of the bullet that killed Dawkins.

127.    Without this knowledge, DA Colston called GBI forensic specialist Jay Jarvis to testify regarding the bullet hole in the skull of the dog carcass found near Dawkins's grave.

128.    Defendant Jarvis personally transported the exculpatory .22 bullet

from the GBI Crime Lab to the courthouse. DA Colston was unaware of this fact,

or that the GBI had determined the caliber of the bullet.[4]

129.    When asked by DA Colston if he knew what kind of bullet made the

hole in the dog's skull, Jarvis falsely testified that he did not know. Colston

unknowingly elicited this false testimony that was presented to the jury.

130.    Jarvis concealed both the fact that a bullet had been removed from the

dog's skull and the fact that the bullet was a .22 because he knew or should have

known those facts, if revealed to the District Attorney, would have been

---

[4] In her testimony at the evidentiary hearing for Watkins's habeas petition, now-Judge Colston explained how the fact that Jarvis brought the bullet to court did not mean she was aware of it. In relevant part, she testified:

> Q.    So Mr. Jarvis has testified in this proceeding earlier, and he testified that he did bring that bullet to court.
> A.    Okay.
> Q.    And it indicates on the Chain of Custody [form] District Attorney's Office.
> A.    Okay.
> Q.    Does that mean someone in your office would have received that bullet, is that a fair reading?
> A.    No, that is not a fair reading, because the way that it works, and I don't know if you have been involved with trial work, but the way it works is the officer who has custody of the evidence brings it into the courtroom. What you place into evidence goes to the court reporter. What you don't place into evidence goes back with the officer. No, it's never in the custody of the District Attorney's Office.

March 25, 2022, Habeas Hearing – Day 3, at 434-35.

exculpatory evidence that would have been turned over to Watkins's defense counsel.

131.   Moreover, Jarvis knew or should have known that if the District Attorney was aware of those facts, she would not have attempted to introduce the evidence of the dog carcass found near Dawkins's grave.

### The Concealed Reports of the Cell Phone Investigation Were Material to the Jury's Decision to Convict Watkins

132.   At trial, both the state and defense expert witnesses, relying upon maps and models of various cell towers in the area, offered opinions regarding the location of Watkins's cell phone at the time of the shooting. Disregarding the expert evidence and eyewitness testimony placing the blue Honda miles away from Watkins's cell phone just one minute later, the prosecution's theory was that Watkins was able to drive from the coverage area of the Kingston Tower to the general location of the Dawkins shooting within three minutes.

133.   The reports from Detective Moser and from FCPD investigators that proved that it was impossible for Watkins to shoot Dawkins or to have been in the blue Honda from which the shots originated would have, had they not been concealed, completely discredited the State's theory.

134.   Jury deliberations began on Saturday, June 30, 2001. No verdict was reached that day. The jury took off on Sunday, July 1, to resume deliberations on Monday, July 2.

135.    Decades later, an investigation into Watkins's case discovered the following: over the break, one juror was so concerned about the accuracy of the expert testimony, which she found confusing, that she decided to test the state's theory herself by driving the route Watkins theoretically could have taken. The juror's private investigation, which a court later found to be "riddled with inaccuracies," caused her to incorrectly conclude that Watkins could have driven to the scene of the Dawkins shooting.

136.    But for the concealment of both Moser and Sutton's investigation concluding that Watkins could not have killed Dawkins or been in the blue Honda with Dawkins's shooter, the juror(s) would have had this evidence to consider in deliberations.

### Watkins is Convicted and Sentenced to Life in Prison

137.    On Monday, July 2, 2001, when the jury resumed deliberations, the juror shared her flawed independent research with some other jurors.

138.    The jury then returned its verdict. Watkins was convicted and sentenced to life imprisonment.

### The Georgia Supreme Court, Misled by Defendants' Fabrications and Concealments, Affirms Watkins's Conviction

139.    The Georgia Supreme Court considered Watkins's appeal in 2003. During the pendency of this appeal, the named Defendants continued to conceal

evidence known by and available only to them which demonstrated both Watkins's innocence and the wrongfulness of his conviction.

140.   As a direct and foreseeable result of Defendants' continued misconduct, the Georgia Supreme Court affirmed Watkins's conviction on May 19, 2003.

### Watkins's Post-Conviction Efforts Fail Due to Defendants' Misconduct

141.   Watkins filed an initial habeas petition in state court on April 27, 2004. The petition was amended five years later. Watkins's state-court habeas petition was denied on December 20, 2011, following an evidentiary hearing.

142.   Watkins filed a habeas petition in federal court in 2012. Watkins's federal-court habeas petition was denied in February 2013.

143.   Throughout the pendency of Watkins's habeas petitions, the named Defendants continued to conceal evidence known by and available only to them which demonstrated both Watkins's innocence and the wrongfulness of his conviction.

### The Georgia Innocence Project Takes on Watkins's Case

144.   In 2011, Watkins contacted the Georgia Innocence Project and asked that they help with his efforts to prove his innocence and the wrongfulness of his conviction. At that point, Watkins's parents had expended tens of thousands of

dollars and countless hours in efforts to have their son's wrongful conviction overturned.

145.   In 2014, the GIP began seeking information and documentation from both the FCPD and the GBI.

### GIP's Efforts are Frustrated Due to Defendants' Misconduct

146.   GIP sought records from the GBI on more than a half dozen occasions over a two-year period, beginning in 2014. Based upon the testimony of GBI analyst Jay Jarvis at trial pertaining to the dog found at Dawkins's gravesite, GIP believed records existed at the GBI Crime Lab related to examination of the subject dog carcass.

147.   In its ORARs and communications with GBI staff, GIP referenced the two different GBI case numbers associated with the underlying investigation: (1) Case # 2000-1-1418: the GBI Crime Lab case number for the Dawkins/Watkins case; and (2) Case # 01-0359-01-00: the GBI investigative case number for the Dawkins/Watkins case.

148.   In response to these proper requests for access to records, the GBI repeatedly stated that it had no records whatsoever related to any dog or dog carcass in the Dawkins/Watkins case.

149.   GIP's efforts continued over the course of almost three years because the FCPD and the GBI did not provide the requested information regarding the

underlying investigation and the disposition of evidence. During this time, the individual Defendants continued to conceal the exculpatory evidence and information that was known by and available only to them.

150.    As a result of the FCPD and GBI's failures to provide prompt, complete, and accurate responses to proper requests for information and access to records and evidence from the underlying criminal investigation, Watkins's release from prison and ultimate exoneration were delayed by years.

151.    Finally, in May 2016, through their relentless efforts, GIP attorneys uncovered the name of the GBI Medical Examiner who performed the examination of a dog at a GBI facility in November 2000, Dr. Cameron Snider. Only because Dr. Snider kept a running list of such examinations was GIP able to learn the GBI case number for examination of the subject dog carcass: Case # 2000-7006087. This number was different than the GBI Crime Lab case number for the Dawkins/Watkins case.

152.    The GBI case number that GIP obtained in 2016 is associated only with the examination of the dog found at the gravesite. That case number is not linked in any way to the other two GBI case numbers associated with the Dawkins/Watkins case.

153.    With the new GBI case number in hand, GIP set about making additional requests for documentation and materials related to (i) the FCPD

request for examination of the dog found at the gravesite, and (ii) any GBI reports, and evidence related to forensic work regarding that dog.

154.    Once confronted with the new GBI case number and evidence that a GBI Medical Examiner had examined the dog, the GBI finally produced the additional responsive documents related to GBI's forensic investigation in this case.

155.    Specifically, the GBI produced the following to GIP: (i) a two-page report of medical examiner; (ii) an x-ray of the dog remains; (iii) a chain of custody report for the dog remains and a bullet extracted therefrom; (iv) two photos of the dog's skull; and (v) three photos of the bullet removed from the dog's skull.

156.     Upon information and belief, Defendant Garmon was aware of and had access to these documents before, during, and after Watkins's conviction.

157.    The FCPD, in response to proper requests for access to records and any documentation related to the dog found at the gravesite, repeatedly failed to produce any responsive records or documentation.

158.    The FCPD's failure to produce responsive documents was caused, at a minimum, by fundamental deficiencies in its evidence-maintenance practices and procedures.

159.   For example, the FCPD had no systems in place that would allow it to quickly and accurately ascertain and report what evidence had been collected and processed in a given case.

160.   Floyd County and the FCPD's failures to ensure that a proper evidence-maintenance system was in place meant that a painstaking and time-consuming manual search through a disorganized assortment of paper records was required to produce materials responsive to a post-conviction document request.

161.   FCPD personnel refused to undertake such a search, and Floyd County and FCPD leadership failed to require that FCPD personnel properly responded to evidence and records requests by conducting the required manual search.

162.   Even with the above-referenced documents from the GBI pertaining to the examination of the bullet, the FCPD failed to produce any evidence inventory sheets or chain of custody logs that matched the evidence unquestionably submitted to the GBI.

163.   In October 2016, a GIP staff member reviewed all evidence submission forms created by any officer of the FCPD during the year of 2000. This effort was necessitated by FCPD's failure to have in place an organized, common-

sense system for tracking evidence in a given case by the case number associated with said case.

164.    The GIP staff member located two critical documents that had never before been produced by any FCPD or GBI officer, either during the criminal proceedings against Watkins or during the years of post-conviction efforts undertaken on his behalf.

165.    The documents located by GIP in October 2016 both related to the forensic examination of the remains of the dog found at Dawkins's gravesite: (1) an FCPD evidence submission form completed by Sutton and dated November 14, 2000, which reads, "If projectile present, compare to bullet recovered from victim"; and (2) an FCPD form documenting that FCPD evidence technician Perry Maynard received a "projectile and fragments" from the GBI on August 30, 2001.

166.    The evidence finally obtained from the GBI and the FCPD in 2016 should have been produced to the DA's Office and to Watkins's trial counsel, prior to Watkins's criminal trial, in accordance with *Brady*.

167.    The same evidence should have been produced to GIP years before 2016 in response to GIP requests that were, in all respects, lawful and proper. The failure to do so extended Watkins's wrongful incarceration by years.

**GIP Habeas Petition**

168.    On January 18, 2017, having finally secured this crucial evidence, GIP filed a Petition for Writ of Habeas Corpus on behalf of Watkins. The petition was based on (1) the juror misconduct in conducting an independent investigation; (2) the concealed investigation into the cell tower records and distance travelled; and (3) the misconduct and false testimony of Jarvis and FCPD personnel in concealing *Brady* evidence related to the examination of the dog found at Dawkins's gravesite and the caliber of the bullet found in the dog's head.

169.    The petition was denied as untimely, but that decision was reversed by the Georgia Supreme Court on March 13, 2020, which ruled that Watkins was entitled to an evidentiary hearing.

170.    Following that evidentiary hearing, Judge Don W. Thompson, on April 11, 2022, granted Watkins's habeas petition and ordered a new trial.

171.    As for the significance and materiality of the evidence related to the dog carcass found at Dawkins's grave and the bullet that had killed the dog, Judge Thompson found as follows:

> It is undisputed that the GBI and FCPD reports at issue—which significantly revealed (1) that the FCPD requested that the GBI compare the bullet in the dog remains to the bullet used to shoot Dawkins, (2) that a limited dissection was conducted by the GBI on the grave dog remains pursuant to the FCPD's request, and (3) that a bullet was extracted by the GBI and determined by the GBI to be a .22 caliber—were generated by, and in the possession of, the GBI and/or the FCPD before, during, and after Mr. Watkins' trial.

. . .

[K]nowledge by the defense that a .22 bullet was removed from the dog likely would have prevented the admissibility of the grave dog evidence altogether. Had Mr. Watkins' counsel known about the .22 bullet, they would have been able to use the information to strengthen their objections to the admissibility of the grave dog evidence based on relevance—objections the trial court likely would have sustained as the .22 eviscerated any connection between Dawkins' death and the death of the grave dog. Given the lack of connection between the death of the grave dog and the death of Dawkins, and the lack of connection between the grave dog and Mr. Watkins, the Court finds that disclosure of the .22 bullet to the defense would have rendered the grave dog evidence irrelevant to Mr. Watkins' murder trial.

. . .

Significantly, the fact that the jury was never informed that the grave dog was shot with a .22 bullet let the jury infer that it could have been killed with the same type of weapon as used to shoot Dawkins. This ambiguity paved the way for the prosecutor to make damning closing arguments that Mr. Watkins had a "calling card" or "signature" and wanted to send a message to the victim's family.

. . .

The Court finds that the grave dog evidence was particularly damaging to Mr. Watkins because it was the strongest foundation for the State's argument that Dawkins' death was a personal, hate-driven murder as opposed to what the rest of the evidence suggested: a random road-rage killing.

Final Order and Judgment Granting Writ of Habeas Corpus, at 29, 31, 38–39.

172.    The State appealed from Judge Thompson's Order allowing Watkins

habeas relief. In an opinion issued on December 20, 2022, the Georgia Supreme

Court affirmed the Order.

## Watkins is Released on Bond

173.    On January 3, 2023, Watkins was released on bond pending a determination by the DA's Office as to its next steps in the matter.

174.    At that point, Watkins had been wrongfully incarcerated for more than 22 years.

## Watkins is Finally Exonerated with an Order of Nolle Prosequi

175.    On September 21, 2023, an Order of Nolle Prosequi was entered, and the case against Watkins was dismissed.

176.    Watkins had lived more than half his life in prison for a crime he did not commit.

## CAUSES OF ACTION

## FEDERAL CONSTITUTIONAL CLAIMS

## COUNT I:

## Claim for Fourteenth Amendment Violations – Concealment of Exculpatory Evidence

(Against Garmon, Jarvis, Sutton, B. Shiflett, T. Shifflett, and Maynard, in their Individual Capacities)

177.    Defendants Garmon, Jarvis, Sutton, B. Shiflett, T. Shiflett, and Maynard, in the manner described below in this Count and above at ¶¶ 1-16, 42-45, 52-53, 65, 68-84, 93, 100-104, 113-117, 124-140, 147-167 and 171-172, intentionally and in bad faith, failed to disclose exculpatory and impeachment evidence to the DA's Office as required by *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny.

178.    These Defendants deprived Plaintiff of his clearly established constitutional right of due process of law and fair criminal proceedings by failing to disclose exculpatory and impeachment evidence to the DA, including but not limited to the following:

(a) That the weapon that killed Isaac Dawkins was not the same weapon, or even the same caliber weapon, as the weapon used to kill the dog found at Dawkins's gravesite in February 2000.

(b) That the cell phone tower data showed that it was not possible for Watkins to have shot Dawkins or to have been in the blue Honda from which the shots originated.

(c) That the investigation revealed witness statements and evidence that were inconsistent with Watkins's guilt or impeached the testimony of the trial witnesses, to be established through discovery and proved at trial.

<u>Results of Forensic Testing</u>

179.    These Defendants concealed evidence that the bullet that killed the dog found at Issac Dawkins's gravesite was not a 9mm shell, but rather a .22 caliber shell.

180.    These Defendants knew that this evidence made clear that there was no connection between the murder of Issac Dawkins and the shooting of the dog, and that the admission of the evidence of the dog carcass found at the gravesite was irrelevant.

181.    These Defendants intentionally and in bad faith concealed all evidence related to the caliber of the bullet that killed the dog found at Dawkins's gravesite.

## Cell Tower Investigation Results

182.    These Defendants concealed evidence regarding their and Detective Moser's investigations into cell phone tower data in which they determined that it would not have been possible for Plaintiff to have shot Dawkins at 7:18 p.m. on January 11, 2000, or to have been in the blue Honda from which the shots originated.

183.    These Defendants knew that their investigation, as well as Moser's, which disproved their theory of the crime, were material and exculpatory as to Plaintiff.

184.    These Defendants intentionally and in bad faith concealed all evidence related to the investigation Moser and the FCPD did on the highway seeking cell tower information.

## Impeachment and Exculpatory Evidence from Witnesses

185.    These Defendants concealed witness statements and evidence that impeached the state's witnesses and was exculpatory as to Plaintiff.

186. These Defendants intentionally and in bad faith concealed their investigator notes in spite of their knowledge that the notes were material and exculpatory as to Watkins.

187. These Defendants also concealed their misconduct in coercing and improperly enticing witnesses to provide false statements inculpating Watkins.

188. These Defendants intentionally and in bad faith concealed their misconduct in obtaining false witness statements despite their knowledge that that information was material and exculpatory to Watkins.

189. These Defendants were aware of the material exculpatory and impeachment value of the concealed information and evidence related to the forensic examination of the dog and the bullet, the cell tower investigation results, and their conduct in witness interviews and investigator notes of same, as well as their obligation under *Brady* to disclose same, and intentionally and/or recklessly and in bad faith failed to do so.

190. Any reasonable law enforcement officer in 2000 and 2001 would have known, and these Defendants did know, that the exculpatory and impeachment evidence described in this Count had to be documented and disclosed to the DA's Office.

191. No reasonable officer would have believed that the misconduct described herein was lawful.

192.    These Defendants' intentional and/or reckless failure to disclose exculpatory and impeachment evidence as described in this Count was in bad faith and deprived Plaintiff of his right to a fair criminal process and his constitutional right to due process under the Fourteenth Amendment.

193.    These Defendants' wrongful concealment of exculpatory and impeachment evidence directly and proximately caused Plaintiff's wrongful conviction and deprivation of liberty without due process of law during his 22-year wrongful incarceration, as well as the other injuries and damages set forth in this Complaint and to be proved through discovery and at trial.

## COUNT II:

### Claim for Fourteenth Amendment Violations – Knowing and/or Reckless Use of False Evidence

(Against Sutton, T. Shiflett, and B. Shiflett, in their Individual Capacities)

194.    Defendants Sutton, T. Shiflett, and B. Shiflett, in the manner described below in this Count and above at ¶¶ 1-16, 53, 56-65, 68-79, 85-94, 98-101, 105-111, 118-131, and 171-172, deliberately and intentionally deprived Plaintiff of his constitutional right to a fair trial and due process by knowingly and/or recklessly using false witness statements implicating Plaintiff in crimes he did not commit.

195.    These Defendants knew or reasonably should have known these witness statements to be false and concealed their own misconduct and the circumstances in which these witness statements were obtained.

196.    Specifically, as described in detail in the above-cited paragraphs, FCPD investigators Sutton, T. Shiflett, and B. Shiflett employed threats, coercion, and illicit enticements to obtain false witness statements from jailhouse informants and others implicating Plaintiff in the Dawkins murder.

197.    The misconduct described in this Count was objectively unreasonable, and was undertaken and effected intentionally and in total disregard of the truth and Plaintiff's clear innocence.

198.    Defendants Sutton, T. Shiflett, and B. Shiflett used these false statements to prosecute and convict Plaintiff in violation of his rights secured by the Fourteenth Amendment.

### COUNT III:

### Claim for Fourth and Fourteenth Amendment Violations – Unreasonable Seizure and Malicious Prosecution

(Against Sutton, T. Shiflett, and B. Shiflett, in their Individual Capacities)

199.    As described more fully below in this Count and above at ¶¶ 1-16, 42-45, 53, 55-65, 68-79, 85-101, and 105-111, Defendants Sutton, T. Shiflett, and B. Shiflett instituted a criminal proceeding against Plaintiff despite his actual innocence and these Defendants' knowledge that no probable cause supported the institution of criminal charges against Plaintiff.

200.    Defendants Sutton, T. Shiflett, and B. Shiflett, acting individually and in concert with each other, under color of state law and within the scope of their

employment with Floyd County and the FCPD, caused, instituted, and participated in the initiation of a criminal proceeding against Plaintiff based on false evidence and despite the absence of probable cause.

201.    Thereafter, Defendants Sutton, T. Shiflett, and B. Shiflett concealed and withheld information from the DA's Office and supplied false evidence to the DA's Office that directly resulted in Plaintiff being indicted on charges including murder.

202.    Plaintiff's arrest, indictment, seizure, and trial were instituted and continued by Defendants Sutton, T. Shiflett, and B. Shiflett with malice.

203.    The wrongful actions of these Defendants caused incomplete, misleading, and false evidence and information to be provided to the DA's Office with knowledge that their actions would result in criminal proceedings being pursued against Plaintiff.

204.    The arrest warrant and indictment accusing Plaintiff of murder were secured by false, incomplete, and misleading evidence.

205.    Plaintiff was seized on November 13, 2000, as a result of the initiation of the criminal proceedings, and he remained under state supervision pursuant to the wrongful criminal charges described herein up to and including September 21, 2023, when the proceedings terminated in Plaintiff's favor with the order of nolle prosequi.

206. As a direct and foreseeable consequence of the misconduct described herein on the part of Defendants Sutton, T. Shiflett, and B. Shiflett, Plaintiff was unreasonably and unlawfully subjected to criminal prosecution and more than 22 years of wrongful incarceration.

## COUNT IV:

### Municipal Liability Claim
### *Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978)

(Against Defendant Floyd County)

207. The Floyd County Police Department was at all times relevant to this Complaint an entity controlled and funded by Floyd County, Georgia.

208. At all relevant times, the Chief of Police of the FCPD was selected by officials of Floyd County, and Defendant Floyd County delegated the rules, procedures, and training that applied to officers employed by the FCPD.

209. The Chief of Police of the FCPD was a final policymaker for Floyd County with regard to all investigative, policing, and training activities of the FCPD.

210. The acts and omissions of the FCPD Chief of Police and/or his designee, during the time relevant to this Complaint, constituted the policy, custom, or pattern and practice of Floyd County.

<u>Unconstitutional Policies, Practices, and Customs</u>

211.    Defendant Floyd County, by and through its final policymaker(s), with deliberate indifference, in the manner described in this Count and above at ¶¶ 56-57, 66-67, 79-80, 113-117, 146-167, and 171, created, promulgated, and maintained the following policies, customs, or patterns which deprived Plaintiff of his constitutional rights as follows:

(a) Knowingly allowing to exist a policy or practice in which investigator notes were categorically excluded from the materials placed within the official investigative file for a case such that notes and information constituting exculpatory or impeachment evidence subject to *Brady* was systematically excluded from disclosures made to the DA's Office and attorneys for criminal defendants.

(b) Failing to properly train, supervise, and/or discipline FCPD investigators with regard to their constitutional duties not to (i) fabricate evidence; (ii) coerce false statements; (iii) conceal exculpatory evidence; (iv) intentionally or recklessly fail to conduct an investigation to determine the true facts; and (v) ignore evidence that points to the innocence of a suspect.

(c) Encouraging, promoting, ratifying, and condoning FCPD investigators to (i) fabricate evidence; (ii) coerce false statements; (iii) conceal exculpatory evidence; (iv) intentionally or recklessly fail to conduct an investigation to determine the true facts; and (v) ignore evidence that points to the innocence of a suspect.

(d) Creating, promulgating, ratifying, and condoning policies, practices, and customs which allowed and encouraged FCPD investigators to solicit false witness statements and testimony by threats, coercion, and improper entreaties to individuals known to be susceptible to enticements and/or threats to make false inculpatory statements, including but not limited to inmates at the Floyd County Jail and those easily influenced and/or susceptible to threats of criminal liability.

(e) Creating, promulgating, ratifying, and condoning policies, practices, and customs which encouraged FCPD investigators to not memorialize witness statements and interviews such that the FCPD investigative file provided to the DA's Office was effectively "sanitized" to contain only materials supporting FCPD investigators' desired narrative for a particular investigation.

(f) In other respects, to be proved through discovery and at trial.

212.    The wrongful acts and omissions that caused Plaintiff's wrongful arrest, prosecution, conviction, and incarceration were carried out pursuant to Defendant Floyd County's unconstitutional policies, customs, or patterns and practices.

213.    These policies, customs, or patterns and practices of Floyd County proximately and directly caused Plaintiff's wrongful arrest, prosecution, conviction, and incarceration.

214.    Defendant Floyd County condoned and ratified the policies, customs, or patterns and practices of FCPD investigators at issue in this lawsuit, despite having actual knowledge that they routinely violated individuals' rights and took actions that caused wrongful arrests and prosecutions.

215.    As a direct and foreseeable consequence of the unconstitutional policies, customs, or patterns and practices as described above, Plaintiff was wrongfully arrested, prosecuted, convicted, and incarcerated, and suffered physical, emotional, psychological, and pecuniary damages as described in this Complaint and to be proved through discovery and at trial.

<u>Failure to Train, Supervise, or Discipline</u>

216.    Defendant Floyd County also failed to train, supervise, and discipline FCPD personnel and officers both prior to and throughout the wrongful prosecution of Plaintiff.

217.    As a direct and proximate result of Defendant Floyd County's failure to properly train, supervise, and discipline FCPD personnel, including but not limited to Defendants Sutton, T. Shiflett, and B. Shiflett, Plaintiff was wrongfully prosecuted, unlawfully seized without probable cause, and wrongfully incarcerated for 22 years.

218.    Defendant Floyd County was aware or reasonably should have been aware of the widespread and serious misconduct resulting from the gross deficiencies in training and supervising FCPD investigators and was also aware of the likelihood that citizens' rights would be violated, and that wrongful arrests and prosecutions would result.

219.    In spite of this knowledge of the need for training and supervision of FCPD investigators, Defendant Floyd County was deliberately indifferent to the need for adequate training and supervision of FCPD investigators.

220.    Throughout Plaintiff's wrongful incarceration, Defendant Floyd County condoned the unconstitutional conduct of FCPS investigators, including but not limited to the Defendants named herein, despite knowing that this conduct

would and did result in the wrongful convictions and imprisonment of innocent persons.

221.    Plaintiff has been informed and alleges upon information and belief that law enforcement officials in Floyd County engaged in a pattern and practice of wrongful convictions in Floyd County.

222.    Plaintiff has been informed and therefore alleges upon information and belief that Defendant Floyd County was aware of a pattern of similar constitutional violations by untrained and unsupervised employees of the FCPD and remained deliberately indifferent to the need to train and supervise those employees.

223.    Similar deficiencies in basic investigatory tasks, as well as adherence to *Brady* obligations, directly led to the wrongful convictions of Daryl Lee Clark and Cain Joshua Storey in 1998. It is anticipated that discovery will reveal similar violations of individuals' rights and improper prosecutions.

224.    Alternatively, the need for training was so obvious and the likelihood that constitutional violations would result due to such lack of training was so great, Defendant Floyd County is subject to municipal liability based upon its deliberate indifference to the obvious need for appropriate training.

225.    Training and supervision of FCPD personnel was grossly deficient and constitutionally inadequate with respect to the following topics: (i) processing

and documenting crime scenes; (ii) memorializing witness interviews; (iii) maintaining documentation related to witness interviews; (iv) enticing, pressuring, and coercing witnesses to make false statements incriminating others; and (v) identifying, preserving, and producing exculpatory and impeachment evidence as required by law.

226.    Defendant Floyd County's deliberate indifference to the need for proper training and supervision of FCPD investigators is evidenced by the following:

(a) Floyd County and FCPD leadership allowed a policy or practice in which investigator notes were deemed not part of the official investigative file for a case such that, as a matter of course, material exculpatory and impeachment evidence subject to *Brady* was never provided to the DA's Office or to attorneys for criminal defendants. Despite being aware of this widespread practice, Floyd County and FCPD leadership failed to properly train officers to include such notes in the investigative file.

(b) Floyd County and FCPD leadership failed to educate, train, and supervise FCPD investigators with respect to their disclosure obligations under *Brady* despite the obvious need for such training in that investigators would, on a regular and ongoing basis, be confronted with situations in which they were required to disclose exculpatory and impeachment evidence to prosecutors to adequately fulfill their lawful obligations.

(c) FCPD investigators routinely sought and solicited unreliable statements from jailhouse informants with knowledge that such statements were untrue and would result in false and fabricated evidence being used in the prosecution of innocent persons. Promises and entreaties and the lures of illicit benefits were so common that inmates would openly bargain with investigators for favors and investigators would indulge those requests in exchange for sought-after statements and testimony. Floyd County and FCPD officials were aware of the obvious need for

training and supervision regarding the solicitation of unreliable statements from jailhouse informants yet failed to provide such for FCPD investigators.

(d) Substantial exculpatory and impeachment evidence subject to disclosure pursuant to *Brady* was never provided to the DA's Office and thus was not provided to Plaintiff's trial counsel. Defendant Floyd County and FCPD officials failed to provide training and supervision to FCPD personnel regarding their disclosure obligations despite their knowledge of non-compliance with those obligations and the fact that criminal defendants' constitutional rights would be violated due to the deliberate indifference to the obvious need for training and supervision on this subject.

(e) In other respects, to be proved through discovery and at trial.

227.    Plaintiff expressly alleges that the need for training and supervision regarding the topics identified above was so obvious that Defendant Floyd County was on notice of both the lack of training and supervision and the fact that individuals' rights and safety were at near-certain risk of violation due to those widespread and persistent deficiencies.

228.    Defendant Floyd County was deliberately indifferent to the obvious need for proper training and supervision and the risks that would accompany the continued absence of proper training and supervision.

229.    For the foregoing reasons, Defendant Floyd County is liable for its municipal policy of failing to provide training and supervision with respect to the law enforcement obligations and duties as outlined in this Count.

230.    As a direct and proximate result of those failures on the part of Defendant Floyd County, Plaintiff was subjected to unlawful seizure and arrest, a wrongful conviction, and the loss of 22 years of his life due to his wrongful incarceration.

**COUNT V:**
**Claim for Suppression of Exculpatory Evidence**
**and Deprivation of Effective Access to Courts**
**in Violation of the First and Fourteenth Amendment**

(Against all Defendants)

231.    In the manner fully described below in this Count and above at ¶¶ 1-16, 42-45, 49-50, 52-53, 56-143, 146-167, and 171, Defendants deprived Plaintiff of his constitutional right to due process of law and meaningful access to the courts by concealing from the District Attorney and those acting on his behalf evidence that demonstrated his innocence and the wrongfulness of his conviction.

232.    As a result of Defendants' unconstitutional actions and omissions, Plaintiff was deprived of evidence that would have allowed him to successfully challenge his wrongful conviction through post-conviction remedies that were available to him, including but not limited to an Extraordinary Motion for New Trial or a Petition for a Writ of Habeas Corpus.

233.    But for the evidence which the individual Defendants, as well as Floyd County by and through the FCPD, failed to disclose and continued to conceal during post-conviction proceedings, Plaintiff's attempts to establish his

innocence would have been successful and would have resulted in Plaintiff's exoneration and release from prison.

234.   The individual Defendants, as well as Floyd County and its agents, were, at all relevant times, aware of Plaintiff's persistent and truthful denial of guilt with respect to the Dawkins murder, and of the efforts by and on behalf of Plaintiff to uncover evidence necessary to prove Plaintiff's innocence during post-conviction proceedings.

235.   Defendant Floyd County and its agents, as well as the individual Defendants, obstructed Plaintiff's constitutional rights by denying him and those acting on his behalf access to evidence that would demonstrate his innocence and the wrongfulness of his conviction.

236.   Defendant Floyd County's failure to adopt a system to maintain proper police records, preserve their condition, and ensure the records were capable of being produced in court proceedings deprived Plaintiff of his constitutional right of due process and effective access to the courts.

237.   The individual Defendants failed to create contemporaneous records related to their investigatory steps with respect to the underlying investigation.

238.   The failure to create adequate documentation led to substantial delays in Plaintiff's exoneration efforts because records that should have existed either could not be found or were never created.

239.    Defendant Floyd County failed to implement proper systems or controls to ensure that crime-scene evidence and records of criminal investigations were maintained.

240.    As a direct and proximate result of those systemic failures, which had the force of municipal policy or custom, Floyd County and its agents at the FCPD flouted proper requests for production of records and evidence throughout the entirety of Plaintiff's post-conviction efforts—including through the time of Plaintiff's exoneration in 2023—and failed to produce exculpatory evidence within its custody and control.

241.    Those failures, combined with those of the individual Defendants, deprived Plaintiff of evidence needed to demonstrate his innocence and substantially extended his period of wrongful imprisonment.

242.    Defendant Floyd County, by and through the FCPD, as well as the individual Defendants involved in the underlying investigation and prosecution, had in their possession evidence, documents, and information that would have proved the wrongfulness of Plaintiff's conviction and helped him establish his factual innocence and secure his release from prison.

243.    Plaintiff and those working on his behalf repeatedly requested that they be provided access to relevant evidence, documents, and information so that Plaintiff could prove his innocence and wrongful incarceration.

244.    Repeatedly, through wrongful acts and the County's adherence to unconstitutional policies, customs, and practices, Plaintiff and those working on his behalf were provided deficient, incomplete, and untimely responses, resulting in Plaintiff being denied access to evidence that would have exonerated him and to effective access to the courts of Georgia.

245.    Defendant Floyd County's violation of Plaintiff's rights as alleged in this Count, together with the misconduct of the individual Defendants, resulted in the concealment of records, information, and evidence, and thereby caused Plaintiff additional damages as his ultimate exoneration and release from prison was substantially delayed.

246.    Plaintiff suffered additional physical injuries, as well as mental anguish, embarrassment, humiliation, and emotional distress, during these years of additional imprisonment as his efforts to secure his release were unsuccessful and he continued to languish in prison despite his innocence.

## **DAMAGES**

247.    As a direct and proximate result of Defendants' violations of Plaintiff's civil and constitutional rights, Plaintiff was arrested, deprived of fair criminal proceedings, wrongfully convicted, and imprisoned for more than 22 years for crimes he did not commit.

248.   As a result of Plaintiff's wrongful conviction and imprisonment, Plaintiff sustained physical injuries and sicknesses and other personal injuries, entitling him to recover compensatory damages, including but not limited to:

(a) humiliation, indignities, and embarrassment;

(b) damage to reputation;

(c) damage to family relations;

(d) inadequate medical and dental care;

(e) poor nutrition;

(f) physical pain and suffering;

(g) severe emotional distress;

(h) depression;

(i) restrictions on all forms of personal freedom including but not limited to diet, sleep, human contact, educational opportunity, employment, athletic opportunity, physical activity, personal fulfillment, parental responsibilities, access to media and technology, travel, and the right to express oneself and to live a life of one's own choosing; and

(j) such other injuries as may be shown by the evidence.

249.   The acts of the individual Defendants alleged above were willful, wanton, intentional, and evidenced a reckless disregard for and indifference to the rights and safety of the public, including Plaintiff, who as a result spent more than 22 years in prison for crimes he did not commit.

250.    Defendants are jointly and severally liable to Plaintiff for compensatory damages resulting from the violation of his civil rights as described herein.

251.    For the reasons set forth above, the individual Defendants should also be subject to punitive damages in an amount sufficient to punish them for their wrongful actions and to deter others from such misconduct in the future.

252.    Plaintiff is entitled to recover his reasonable attorneys' fees and litigation expenses from Defendants pursuant to 42 U.S.C. § 1988.

## **PRAYER FOR RELIEF**

Based on the foregoing, Plaintiff respectfully prays for the following relief:

1.    Compensatory damages from all Defendants, jointly and severally, in an amount to be determined at trial.

2.    Punitive damages from the individual Defendants, jointly and severally, in an amount to be determined at trial, that will deter such conduct by Defendants and other officials and law enforcement officers in the future.

3.    Reasonable attorneys' fees and litigation expenses from Defendants under 42 U.S.C. § 1988.

4.    Costs of court and interest as allowed by law.

5.    A trial by jury on all contested issues of fact.

6.    Such other and further relief as the Court may deem just and proper.

This the 30th day of May 2025.

**WEINBERG, WHEELER, HUDGINS, GUNN & DIAL, LLC**

**By:** _/s/ Henry C. Debardeleben IV_

Henry C. Debardeleben IV
GA Bar No. 111320
3344 Peachtree Road N.E., Suite 2400
Atlanta, GA 30326
Telephone: 404-876-2700
Fax: 404-875-9433
HDebardelebenIV@wwhgd.com
_Local Counsel for Plaintiff Joseph "Joey" S. Watkins_

**PFEIFFER RUDOLF**

**By:** _/s/ Sonya Pfeiffer_

Sonya Pfeiffer (NC Bar No. 37300)
David S. Rudolf (NC Bar No. 8587)
Elizabeth Ames (NC Bar No. 63121)
2137 South Boulevard, Suite 300
Charlotte, North Carolina 28203
Telephone: (704) 333-9945
Facsimile: (704) 335-0224
spf@pr-lawfirm.com
dsr@pr-lawfirm.com
eba@pr-lawfirm.com
_Attorneys for Plaintiff Joseph "Joey" S. Watkins_
(Pending _Pro Hac Vice_ Admittance)