## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

JOSEPH "JOEY" S. WATKINS,

     Plaintiff,

v.

FLOYD COUNTY, GEORGIA *et al.*,

     Defendants.

CIVIL ACTION FILE NO:

4:25-cv-00136-WMR

## ORDER

This matter is before the Court on Defendant Floyd County, Georgia's Motion to Dismiss [Doc. 34], Defendant Francis Jarvis's Motion to Dismiss [Doc. 40], and Defendant James R. Garmon's Motion to Dismiss [Doc. 42].

## I.    BACKGROUND

The Court derives the following facts from Plaintiff Joseph "Joey" Watkins's complaint. [Doc. 1].[1]

### A. Initial Incident and Investigation of Plaintiff

On January 11, 2000, around 7:18 P.M., Isaac Dawkins was shot in the back of the head and murdered while driving in Rome, Georgia. [Doc. 1 ¶¶ 29–30].

---

[1]In deciding these Motions, the Court accepts all the Complaint's well-pleaded allegations as true, except Paragraph 129, which the Court struck on August 4, 2025. [Doc. 49]. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

Another driver, Wayne Benson, called 911 when he saw Dawkins's truck veer off the highway. [*Id*. ¶ 32]. Within minutes, first responders arrived and transported Dawkins to Floyd Medical Center. [*Id*. ¶ 33]. The Rome Police Department ("RPD") also responded to the scene. [*Id*.]. After 9:00 P.M., RPD detective Jim Moser ("Moser"), the lead investigator of the case, learned that Dawkins's hospital scan showed a bullet from a 9mm handgun lodged into his skull. [*Id*. ¶¶ 34–35]. After learning about the bullet, Moser instructed law enforcement to treat the wreck as a crime scene. [*Id*. ¶ 35].

Soon after, Moser began interviewing witnesses. [*Id*. ¶ 36]. First, Moser interviewed Benson, the 911 caller. [*Id*.]. Benson explained that he saw an "extended interaction between Dawkins's truck and an older-model, blue Honda." [*Id*.]. "Benson told Moser that the small blue Honda had darted in front of Dawkins's truck, causing Dawkins to slam on his breaks, then the two vehicles drove erratically together until Dawkins's truck left the roadway." [*Id*.]. This statement led Moser to conclude that the gunshot came from the blue Honda. [*Id*. ¶ 37].

Next, Moser interviewed Dawkins's friends and family. [*Id*. ¶ 39]. One of the interviewees, Brianne Scarber, had dated both Dawkins and Plaintiff. [*Id*.]. She told Moser that the two men had prior disagreements. [*Id*. ¶ 40]. Based on this information, Moser began investigating Plaintiff. [*Id*. ¶ 41].

On January 14, 2000, RPD investigators interviewed Plaintiff. [*Id*. ¶ 42]. During that interview, Plaintiff told the investigators that he had an alibi for that evening. [*Id*.]. Plaintiff's alibi was corroborated by independent witnesses and cell phone data which confirmed that Plaintiff was speaking to his girlfriend on the phone at the time of the shooting. [*Id*. ¶¶ 42–44]. Because Plaintiff was using a handheld phone, Plaintiff stated that it would not have been possible for him to drive his car, use his phone, and kill Dawkins at the same time. [*Id*.]. Moser fact-checked Plaintiff's alibi and eliminated him as a suspect. [*Id*. ¶¶ 43–45].

Later, Moser learned that the same night of Dawkins's murder, another driver called 911 to report a blue Honda driving aggressively. [*Id*. ¶ 46]. Moser identified this blue Honda driver as Heath Wilson. [*Id*.]. Moser also discovered that on the same night of Dawkins's murder, Wilson had fired a 9mm pistol at a man during a road rage altercation. [*Id*. ¶ 47]. Following that discovery, RPD arrested Wilson for the road rage shooting and began to investigate him for Dawkins's murder. [*Id*. ¶¶ 47–48].

### B. FCPD's Stanley Sutton's Takeover of the Investigation and Further Investigation of Plaintiff

Meanwhile, the Dawkins Family allegedly began to grow frustrated with the lack of arrest in their son's murder. [*Id*. ¶ 48]. In February 2000, when Dawkins's father visited his son's grave, he found a dog carcass that had been shot nearby. [*Id*. ¶ 49]. This allegedly led Dawkins's father to grow concerned that RPD was not

properly conducting the investigation. [*Id.*]. Dawkins's father informed Captain Houston Freeman of the Floyd County Police Department ("FCPD") about the dog carcass and discussed his feelings of discontent with the investigation. [*Id.*]. Following that conversation, FCPD took over Dawkins's murder investigation and placed investigator Stanely Sutton in charge. [*Id.* ¶ 51].[2] Around this time, the Georgia Bureau of Investigation ("GBI") also became involved in the investigation and placed James Garmon in charge of its involvement in Dawkins's case. [*Id.* ¶ 52].

On March 7, 2000, Moser, no longer leading the investigation, contacted the GBI and gave the officers his reports. [*Id.*]. Although Sutton and other investigators had access to these reports, they decided to conduct an independent investigation. [*Id.* ¶ 70]. First, Sutton interviewed Wilson (the driver of the other blue Honda) about his involvement with Dawkins's murder. [*Id.* ¶ 54]. Wilson denied any involvement. [*Id.*]. After this denial, Sutton discontinued his investigation into Wilson. [*Id.*].

Next, to aid in his investigation, Sutton placed reward posters in Floyd County Jail seeking information about Dawkins's murder. [*Id.* ¶¶ 56, 61–62]. This allegedly led to multiple leads from detainees. [*Id.*]. However, Plaintiff's alleges that these leads were untrustworthy because "Sutton and other FCPD defendants provided details about the crime and the investigation to" the detainees. [*Id.* ¶ 63]. Plaintiff

---

[2] Sutton worked closely with two other FCPD investigators: Tommy Shiflett and Bill Shiflett. [*Id.* ¶ 53].

claims this led to false statements made by the detainees. [*Id*.]. Further, Plaintiff states that the investigators "knew, or reasonably should have known, that the statements proffered by these witnesses were false." [*Id*. ¶ 64]. He claims that "[n]onetheless, these defendants knowingly and/or recklessly made use of these witnesses' false statements in the prosecution of [Plaintiff]." [*Id*.].[3]

Next, Plaintiff alleges that "Sutton and T. Shiflett, with the knowledge and assent of B. Shiflett," investigated Plaintiff. [*Id*. ¶¶ 69–71]. The three men allegedly "drove a car with a cell phone to investigate which tower the cell phone would connect to at various points in time during the drive, while timing to the drive itself." [*Id*. ¶ 71]. Plaintiff alleges that this investigation showed "that it was physically impossible for [Plaintiff] to have shot Dawkins or to have been in the blue Honda." [*Id*. ¶ 75]. Plaintiff claims that "[i]n summary, these FCPD investigators disproved their own theory of what occurred on January 1, 2000." [*Id*. ¶ 76]. However, neither Plaintiff nor the District Attorney's office ever received the evidence from this investigation that eventually exculpated Plaintiff. [*Id*. ¶¶ 79–80].[4]

---

[3]Plaintiff claims that FCPD was aware of Sutton's alleged regular practice of using detainees to procure statements related to pending investigations. [*Id*. ¶ 66]. Plaintiff supports this by citing a 1989 incident where FPCD suspended Sutton for fifteen days and placed him on a six-month probation. [*Id*. ¶ 67]. This occurred when Sutton threatened a detainee informant with a gun after that informant had previously provided Sutton with "information" related to an investigation. [*Id*.]. The report also stated that Sutton had engaged in "similar" behavior on multiple other occasions. [*Id*.].

[4] Plaintiff claims that this information continued to be concealed by FCPD investigators during Plaintiff's post-conviction appeal efforts, and multiple Open Records Acts requests. [*Id*. ¶ 80]. Additionally, in 2014, the Georgia Innocence Project, while working on Plaintiff's case, submitted

## C. Other Alleged Exculpatory Evidence

Next, Plaintiff alleges that "[o]n November 9, 2000, Defendant Sutton told Garmon that he and FCPD investigators were pursuing [Plaintiff] as a suspect, but 'no evidence has been obtained to lead to an arrest.'" [*Id*. ¶ 85]. Two days later, Sutton, T. Shiflett, and B. Shifflet all allegedly traveled to Virginia to obtain a statement from Josh Flemister, a friend of Plaintiff who struggled with substance abuse issues. [*Id*. ¶ 86]. The three investigators allegedly took an impaired Flemister to a motel room and coerced a statement in which he claimed to have been present at the time of Dawkins's murder. [*Id*. ¶ 88].

Then, on November 12, 2000, the three investigators brought Flemister's statement and the various detainee statements to the prosecutor to seek approval for filing charges against Plaintiff. [*Id*. ¶ 93]. The next day, Plaintiff was arrested for murder and conspiracy to commit murder. [*Id*. ¶ 94]. Two days after Plaintiff's arrest, Flemister allegedly informed Sutton, T. Shiflett, and B. Shiflett that his statement was untrue and that he only gave the  statement because he was under the

---

a separate Open Records Act request. [*Id*. ¶ 81]. This request revealed a note authored by Garmon which reads: "Investigator Sutton stated that Captain Tommy Shiflett of the Floyd County Police Department, using a cellular phone, had made several test calls starting at the residence of [Plaintiff], and traveling to the crime scene where Isaac Dawkins was shot. Investigator Sutton stated that the calls were linked to several different cellular towers in the Rome/Floyd County area, some overlapping, and would furnish a copy of his report upon receipt." [*Id*.]. As stated, neither Plaintiff's attorneys nor the district attorney ever received this note. [*Id*. ¶ 83]. And, Plaintiff states that "[i]t was the importance of this concealed evidence that ultimately led to [Plaintiff's] conviction being overturned." [*Id*. ¶ 84].

influence and intimidated. [*Id*. ¶ 100]. But, the investigators allegedly took no action to rectify their reliance on this statement when they learned this.

On December 14, 2000, Sutton testified at Plaintiff's probable cause hearing. [*Id*. ¶ 105]. During that testimony, Sutton relied on Flemister's recounted statement. [*Id*. ¶ 106]. The prosecutor stated that Flemister's statement "was key to the finding of probable cause, describing it as the 'most important' statement." [*Id*. ¶ 108]. The judge found probable cause for Plaintiff's arrest, and Plaintiff was indicted on January 26, 2001. [*Id*. ¶¶ 109, 111].

Around that time, FCPD investigators sent the dog carcass found near Dawkins's grave to the GBI for further testing. [*Id*. ¶ 102]. The GBI determined that the bullet found within the dog's carcass was a .22 caliber, which did not match the 9mm bullet used in Dawkins's murder. [*Id*. ¶ 104].

### D. Plaintiff's Trial

Plaintiff's trial was in June 2001. [*Id*. ¶ 112]. Before trial, Plaintiff's attorneys sought any exculpatory or impeachment evidence. [*Id*. ¶ 113]. While the prosecutor's office turned over the evidence it possessed, Plaintiff claims that FCPD and the GBI concealed the following evidence:

(a) Notes, records, and other materials documenting Sutton, T. Shiflett, and B. Shiflett's investigation into the distances and travel times between the relevant locations;

(b) Notes, records, and other materials documenting Detective Moser's investigation into the distances and travel times between the relevant locations;

(c) Notes, records, and other materials that impeached the false statements procured from jailhouse informants; and

(d) Notes, records, and other materials evidencing their request that the GBI extract the bullet found in the head of the dead dog near Dawkins's grave and compare it to the bullet that killed Dawkins.

[*Id*. ¶ 116].

Additionally, before trial, Assistant District Attorney Tami Colston sought to introduce the evidence of the dog carcass. [*Id*. ¶ 118]. Allegedly, "Colston sought to introduce this evidence" because FCPD investigators claimed, "that Plaintiff had previously shot a dog owned by the Dawkins family in 1999." [*Id*. ¶ 119]. Colston argued that the dog carcass was Plaintiff's "signature." [*Id*. ¶ 120]. The judge ruled that this evidence was admissible at trial. [*Id*. ¶¶ 121–22].[5]

During trial, Colston called GBI forensic specialist Jay Jarvis to testify about the dog carcass. [*Id*. ¶ 127]. Plaintiff states that "Defendant Jarvis personally transported the exculpatory .22 bullet from the GBI crime lab to the courthouse. DA Colston was unaware of this fact, or that the GBI had determined the caliber of the bullet." [*Id*. ¶ 128]. Plaintiff contends that this information, if turned over to Colston, would have been exculpatory evidence that Plaintiff's counsel would have received. [*Id*. ¶ 130]. Plaintiff further argues that Jarvis knew or should have known that

---

[5] After the GBI made its determination that the dog was shot with a different bullet than Dawkins, FCPD evidence technician Perry Maynard received "projectile and fragments" from the GBI. [*Id*. ¶ 125]. However, that evidence was not turned over to the Prosecutor. [*Id*.]. In fact, Plaintiff alleges that both "the FCPD and GBI defendants concealed from DA Colston that the bullet was removed from the dog carcass and that the bullet did not match the caliber of bullet that killed Dawkins." [*Id*. ¶ 126].

Colston would not have introduced information about the dog carcass, had she known those facts. [*Id.* ¶ 131].

Also, during the trial, both parties "offered opinions regarding the location of [Plaintiff's] cell phone at the time of the shooting." [*Id.* ¶ 132]. Plaintiff alleges that "[t]he reports from Detective Moser and from FCPD investigators that proved that it was impossible for [Plaintiff] to shoot Dawkins or to have been in the blue Honda from which the shots originated would have, had they not been concealed, completely discredited the State's theory." [*Id.* ¶ 133].

Jury deliberations began Saturday, June 30, 2001. [*Id.* ¶ 134]. When the jury did not reach a verdict that day, they took off to resume deliberations on Monday, July 2, 2001. [*Id.*]. Later investigations revealed that "over the break, one juror was so concerned about the accuracy of the expert testimony, which she found confusing, that she decided to evaluate the state's theory herself by driving the route [Plaintiff] theoretically could have taken. The juror's private investigation, which a court later found to be 'riddled with inaccuracies,' caused her to incorrectly conclude that [Plaintiff] could have driven to the scene of the Dawkins shooting." [*Id.* ¶ 135].

That juror shared her findings with the other jurors. [*Id.* ¶ 137]. On Monday, July 2, 2001, the jury convicted Plaintiff and sentenced him to life imprisonment. [*Id.* ¶ 138]. The Georgia Supreme Court affirmed Plaintiff's conviction on May 19, 2003. [*Id.* ¶ 140]. Plaintiff filed various habeas petitions that were repeatedly denied.

[*Id*. ¶¶ 141–43]. Plaintiff alleges that throughout these efforts, the Defendants continued to conceal information. [*Id*.].

### E. Georgia Innocence Project

In 2014, the Georgia Innocence Project ("GIP") began to seek evidence from Plaintiff's case. [*Id*. ¶ 145]. At first, GIP struggled to locate exculpatory evidence. [*Id*. ¶¶ 146–50]. However, in 2016, GIP obtained the following evidence from the GBI: "(i) a two-page report of medical examiner; (ii) an x-ray of the dog remains; (iii) a chain of custody report for the dog remains and a bullet extracted therefrom; (iv) two photos of the dog's skull; and (v) three photos of the bullet removed from the dog's skull." [*Id*. ¶¶ 151–55].

Plaintiff claims that "[u]pon information and belief, Defendant Garmon was aware of and had access to these documents before, during, and after [Plaintiff's] conviction." [*Id*. ¶ 156]. Plaintiff alleges that FCPD "failed to produce any responsive records or documentation." [*Id*. ¶ 157]. Instead, a "GIP staff member located two critical documents that had never before been produced by any FCPD or GBI officer, either during the criminal proceedings against [Plaintiff] or during the years of post-conviction efforts undertaken on his behalf." [*Id*. ¶¶ 164–65].

GIP also uncovered the following evidence from FCPD related to the dog carcass: "(1) an FCPD evidence submission form completed by Sutton and dated November 14, 2000, which reads, "[i]f projectile present, compare to bullet

recovered from victim"; and (2) an FCPD form documenting that FCPD evidence technician Perry Maynard received a "projectile and fragments" from the GBI on August 30, 2001." [*Id*. ¶ 165]. Plaintiff contends that this evidence "should have been produced to the DA's Office and to [Plaintiff's] trial counsel, prior to [Plaintiff's] criminal trial, in accordance with *Brady*." [*Id*. ¶ 166]. And, that "[t]he same evidence should have been produced to GIP years before 2016 in response to GIP requests that were, in all respects, lawful and proper." [*Id*. ¶ 167]. Plaintiff claims that "[t]he failure to do so extended [Plaintiff's] wrongful incarceration by years." [*Id*.].

### F. GIP Habeas Petition

Following the uncovering of the above-mentioned evidence, on January 18, 2017, GIP filed a Petition for Writ of Habeas Corpus on behalf of Plaintiff. [*Id*. ¶ 168]. GIP based the Petition on the following evidence: "(1) the juror misconduct in conducting an independent investigation; (2) the concealed investigation into the cell tower records and distance travelled; and (3) the misconduct and false testimony of Jarvis and FCPD personnel in concealing Brady evidence related to the examination of the dog found at Dawkins's gravesite and the caliber of the bullet found in the dog's head." [*Id*.]. Although initially denied as untimely, the Georgia Supreme Court reversed and ruled that Plaintiff was entitled to an evidentiary hearing. [*Id*. ¶ 169]. Following that ruling, Superior Court Judge Don W. Thompson granted Plaintiff's

Petition and ordered a new trial. [*Id*. ¶ 170]. The Georgia Supreme Court affirmed Judge Thompon's Order. [*Id*. ¶ 172]. On September 21, 2023, after an Order of Noelle Prosequi, the State's case against Plaintiff was dismissed after twenty-two years of incarceration. [*Id*. ¶¶ 174–75].

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face" and that rises above a speculative level. *Chandler v. Sec'y of Fla. Dep't of Transp.*, 695 F.3d 1194, 1199 (11th Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint must have enough facts to plausibly allege the required elements of a cause of action. *See Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1295–96 (11th Cir. 2007). These facts, accepted as true at the pleading stage, must allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Conclusory allegations and legal conclusions "masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) (citation omitted); *see also Iqbal*, 556 U.S. at 678 (noting that "naked assertions devoid of further factual enhancement" are insufficient) (citation omitted). "[A] plaintiff armed with nothing more than conclusions" cannot "unlock the doors of discovery." *Iqbal*, 556 U.S. at 678–79. Additionally, "[t]hreadbare recitals of the elements of a cause of action,

12

supported by mere conclusory statements, do not suffice." *Id*. at 678 (citation omitted).

## III.    DISCUSSION

### A. Defendant Floyd County's Motion to Dismiss

#### 1.  Monell Claim

Plaintiff asserts claims against Floyd County for its alleged unconstitutional policies, practices, and customs and its failure to train, supervise, or discipline its employees. [Doc. 1 at 47–54].

#### a.  Custom or Policy

To subject a municipality to liability pursuant to § 1983, a plaintiff must meet the requirements set out in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). These include: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *Underwood v. City of Bessemer*, 11 F.4th 1317, 1333 (11th Cir 2021) (quoting *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004)). "[T]he plaintiff must demonstrate [that] the municipality's policy or custom was the 'moving force' behind the alleged constitutional violation." *Id*. (citing *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)); *see also Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998) ("It is only when 'the execution of the government's policy or custom

inflicts the injury' that the municipality may be held liable under § 1983.") (citing *Canton*, 489 U.S. at 385).

"Because a county rarely will have an officially-adapted policy of permitting a particular constitutional violation, most plaintiffs . . . must show that the county has a custom or practice of permitting it and that the county's custom or practice is 'the moving force behind the constitutional violation[.]'" *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (quoting *Canton*, 489 U.S. at 379). To successfully identify an unofficial custom, a plaintiff must show that the practice is so "longstanding and widespread" that it is "deemed authorized by the policymaking officials because they must have known about it and failed to stop it[.]" *Craig v. Floyd Cnty.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (citations omitted).

Regarding both official and unofficial policies and customs, a plaintiff must show the county has "authority and responsibility" over the governmental function at issue and identify the officials who "speak with final policymaking authority" for the county concerning the act that caused the alleged constitutional violation. *Grech*, 335 F.3d at 1330 (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). And, as for final policymaker liability, "[o]nly those municipal officials who have final policymaking authority may subject the municipality to section 1983 liability…[,]" and that determination is governed by state law. *Chabad Chayil, Inc. v. School Bd. of Miami-Dade Cnty.*, 48 F.4th 1222, 1229 (11th Cir. 2022).

14

Plaintiff alleges that Floyd County, "with deliberate indifference" "by and through its final policymaker(s)" "created, promulgated, and maintained . . . policies, customs, or patterns which deprived Plaintiff of his constitutional rights." [Doc. 1 ¶ 211].[6] Specifically, Plaintiff alleges that Floyd County maintained policies or customs of: (1) coercing witness statements; (2) fabricating and using false evidence; (3) concealing exculpatory evidence; and (4) concealing investigator notes. [*Id.*].

---

[6] Plaintiff alleges the following constitutional deprivations:

    (a) Knowingly allowing to exist a policy or practice in which investigator notes were categorically excluded from the materials placed within the official investigative file for a case such that notes and information constituting exculpatory or impeachment evidence subject to Brady was systematically excluded from disclosures made to the DA's Office and attorneys for criminal defendants.

    (b) Failing to properly train, supervise, and/or discipline FCPD investigators with regard to their constitutional duties not to (i) fabricate evidence; (ii) coerce false statements; (iii) conceal exculpatory evidence; (iv) intentionally or recklessly fail to conduct an investigation to determine the true facts; and (v) ignore evidence that points to the innocence of a suspect.

    (c) Encouraging, promoting, ratifying, and condoning FCPD investigators to (i) fabricate evidence; (ii) coerce false statements; (iii) conceal exculpatory evidence; (iv) intentionally or recklessly fail to conduct an investigation to determine the true facts; and (v) ignore evidence that points to the innocence of a suspect.

    (d) Creating, promulgating, ratifying, and condoning policies, practices, and customs which allowed and encouraged FCPD investigators to solicit false witness statements and testimony by threats, coercion, and improper entreaties to individuals known to be susceptible to enticements and/or threats to make false inculpatory statements, including but not limited to inmates at the Floyd County Jail and those easily influenced and/or susceptible to threats of criminal liability.

    (e) Creating, promulgating, ratifying, and condoning policies, practices, and customs which encouraged FCPD investigators to not memorialize witness statements and interviews such that the FCPD investigative file provided to the DA's Office was effectively "sanitized" to contain only materials supporting FCPD investigators' desired narrative for a particular investigation.

[*Id.*].

Plaintiff claims that these acts and omissions caused his "wrongful arrest, prosecution, conviction, and incarceration[.]" [*Id*. ¶ 212].

Through these allegations, Plaintiff attempts to demonstrate an unofficial custom or widespread practice that constituted deliberate indifference to his constitutional rights. Although Floyd County argues that these allegations are conclusory, the Court disagrees and finds Plaintiff has pleaded sufficient facts to survive Floyd County's Motion to Dismiss.

Central to Plaintiff's claims are the wrongful convictions of Daryl Lee Clark and Cain Joshua Storey, two earlier cases in Floyd County, which involved "[s]imilar deficiencies in basic investigatory tasks, as well as adherence to *Brady* obligations[.]" [*Id*. ¶ 223]. Those cases reasonably support Plaintiff's claim that Floyd County engaged in similar unconstitutional conduct on at least two prior occasions, suggesting a widespread practice that justifies allowing Plaintiff's claims to proceed to discovery. *See Storey v. Floyd Cnty., et al.*, 4:24-cv-00288-WMR (N.D. Ga. Dec. 5, 2024) ("Storey Case"); *Clark v. Floyd Cnty., et al.*, 4:24-cv-00259-WMR (N.D. Ga. Nov. 1, 2024) ("Clark Case").

First, Plaintiff claims that Floyd County encouraged or condoned the coercion of witness statements. Plaintiff claims that five witnesses (Joey Samples, Winford Ellis, Corey Jacobs, Barry Mullinax, and Josh Flemister) were coerced into providing false statements implicating him in Dawkins's murder. [Doc. 1 ¶¶ 63, 86–

92]. Plaintiff also alleges that Sutton, the lead detective, has a history of threatening informant-witnesses. [*Id.* ¶¶ 66–67]. At the motion to dismiss phase, these allegations, combined with the Clark and Storey cases, plausibly suggest that Floyd County maintained an unofficial policy or custom of condoning coerced or false witness statements. *See* Storey Case [Doc. 1 ¶¶ 41–46]; Clark Case [Doc. 1 ¶¶ 47, 132–48].

Second, Plaintiff alleges that Floyd County had a widespread practice of using false statements and fabricated evidence to indict and convict defendants. [*Id.* ¶¶ 59–64, 86–101, 105–11, 198]. The complaint claims that Floyd County officials relied on coerced statements from informants and witnesses to secure convictions. In light of the allegations related to the Clark and Storey convictions, Plaintiff also plausibly alleges a countywide unofficial policy of fabricating and using false evidence. *See* Storey Case [Doc. 1 ¶¶ 45–47, 51–53]; Clark Case [Doc. 1 ¶¶ 47–48].

Third, Plaintiff alleges that Floyd County had a practice of concealing exculpatory evidence. Specifically, the complaint claims that FCPD officials withheld exculpatory information from the prosecutor, including cell phone data, witness impeachment material, and evidence relating to the dog carcass and discrepancies in bullet caliber. [*Id.* ¶¶ 56–67, 86–92, 100–01, 102–04, 118–28, 130–31, 112–17]. These allegations, together with the similar conduct alleged in Clark and Storey, plausibly support the existence of a widespread practice of concealing

17

exculpatory evidence. *See* Storey Case [Doc. 1 ¶ 70]; Clark Case [Doc. 1 ¶ 45, 48, 50].

Finally, Plaintiff alleges that Floyd County maintained a policy or practice of concealing investigator notes. Plaintiff claims that that FCPD officials withheld investigator notes concerning jailhouse informants, cell phone and driving-test investigations, and evidence related to the dog carcass and bullet caliber discrepancies. [*Id*. ¶¶ 65, 112–17]. These allegations, along with similar allegations within the Storey and Clark cases, also plausibly support a policy or custom of concealing investigator notes. *See* Storey Case [Doc. 1 ¶ 70]; Clark Case [Doc. 1 ¶ 310]

Plaintiff alleges that these policies, customs, and practices caused the constitutional violations he suffered. [*Id*. ¶¶ 212–13]. Taken together, Plaintiff's allegations are sufficient to state a plausible claim for municipal liability based on custom or policy. *See Rogers v. City of Atlanta*, 214 F.Supp.3d 1314, 1318 (N.D. Ga. 2016) (finding that allegations that a city had a policy of improperly reviewing complaints, permitting the use of excessive force, and failing to train and supervise officers were sufficient to survive a motion to dismiss).[7]

---

[7]Notably, Plaintiff's complaint does not specifically allege who within Floyd County had knowledge of the alleged wrongdoing sufficient to support the existence of a custom, policy, or practice. *See* [Doc. 1 ¶ 214] ("Defendant Floyd County condoned and ratified the policies, customs, or patterns and practices of FCPD investigators at issue in this lawsuit, despite having actual knowledge that they routinely violated individuals' rights and took actions that caused wrongful arrests and prosecutions."). Nevertheless, at the motion to dismiss stage, the Court finds

### b.  Failure to Train

Second, Plaintiff alleges that Floyd County had a policy of failing to train and supervise its officers. [Doc. 1 ¶¶ 225–26]. He claims that Floyd County failed to train on the following practices: (1) properly interviewing witnesses; (2) identifying, preserving, and producing exculpatory evidence; and (3) ensuring the evidence produced to prosecutors is true. [*Id.*].

A plaintiff can plead a successful *Monell* claim by alleging that supervisors had a policy of failing to train or supervise employees and that failure caused a violation of a plaintiff's constitutional right. *See Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly brought of as a city 'policy or custom' that is actionable under § 1983." *Canton*, 489 U.S. at 389. There are only "limited circumstances in which an allegation of 'failure to train' can be the basis for liability under § 1983." *Canton*, 489 U.S. at 387. In fact, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick v.*

---

that Plaintiff has alleged sufficient facts (when considered in conjunction with the Storey Case and the Clark Case) to plausibly allege that supervisors in Floyd County were aware of and condoned the misconduct.

*Thompson*, 563 U.S. 51, 61 (2011) (citing *Bd. of Comm'rs of Bryan Cnty. v. Bryan*, 520 U.S. 397, 409 (1997)).

In *Canton*, the Supreme Court suggested that there may be situations where "the need for more or different training is so obvious, and the inadequacy [of the training is] so likely to result in the violation of the constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. The Court gave an example: if a city armed its officers with the knowledge that they would likely use their firearms to apprehend fleeing felons, the need to train officers on the use of deadly force would be "so obvious" that failing to do could be seen as deliberate indifference, even in the context of a single incident. *Id.*; *see also Vielma v. Gruler*, 808 F. App'x. 872, 882 (11th Cir. 2020) (holding that a plaintiff failed to allege the type of factual scenario in *Canton* where allegations were "conclusory and skeletal"). Notably, neither the Supreme Court nor the Eleventh Circuit has ever applied the single-incident liability exception. *Velma*, 808 F. App'x. at 883.

The Court agrees with Floyd County that Plaintiff does not allege the narrow type of factual scenario found in *Canton* sufficient to allow his failure to train claim to proceed past this motion to dismiss. *See Canton*, 489 U.S. at 390. Plaintiff fails to allege issues with the training programs in place at the FCPD. Instead, Plaintiff has only set forth conclusory allegations that Floyd County failed to train and supervise

the individual Defendants. Those allegations are insufficient to survive this Motion to Dismiss.

Moreover, Plaintiff's attempt to assert both a failure-to-train claim and a custom or policy claim is internally inconsistent. If the alleged misconduct by Floyd County officials was intentional and sufficiently widespread to constitute an unofficial policy or custom, it is unclear how Floyd County could also be liable for failing to train those same officials. There appears to be no training that would remedy deliberate wrongful conduct, especially when that wrongful conduct was the unofficial policy or custom of Floyd County itself. Accordingly, Plaintiff has not alleged enough for his failure to train claim to proceed.

### 2. Access to Courts Claim

Next, Plaintiff alleges an access-to-courts claim against Floyd County. He claims that because Floyd County maintained policies of failing to preserve and maintain evidence, he could not discover the police misconduct that led to his wrongful conviction. [Doc. 1 ¶¶ 141–67]. Therefore, he states that he did not have "adequate, effective, and meaningful" access to courts. [*Id*.].

To state a claim for violation of his right of access to courts, a plaintiff must show that jail officials "frustrated or impeded [his] efforts to pursue a nonfrivolous legal claim," which "must be an appeal from a conviction for which [he] was incarcerated, a habeas petition, or a civil rights action." *Bass v. Singeltary*, 143 F.3d

1442, 1445 (11th Cir. 1998). To bring an access to courts claim, an inmate "must show actual injury in the pursuit of specific types of nonfrivolous cases: direct or collateral attacks on sentences and challenges to conditions of confinement." *Wilson v. Blankenship*, 163 F.3d 1284, 1290 (11th Cir. 1998). The Supreme Court has outlined the two categories of access to courts claims: (1) "claims where systemic official action frustrates a plaintiff or plaintiff class in preparing and filing a suits at the present time;" and (2) "specific cases that cannot now be tried (or tried with all material evidence), no matter what official action may be in the future." *Christopher v. Harbury,* 536 U.S. 403, 413–14 (2002).

In *Harbury*, the Supreme Court explained that a plaintiff could not maintain a cause of action for denial of access to the courts because the district court had not dismissed her tort claims against the defendants. *Id*. at 422. The Court found that she could still seek monetary damages on those claims. *Id*. Therefore, she had not shown "that she can get any relief on the access claim that she cannot obtain on her other tort claims, *i.e.*, those that remain pending in the District Court." *Id*. The Court explicitly contemplated that a plaintiff could bring an access-to-courts claim in which the underlying cause of action might be for a "different remedy than the one sought under the access claim, or against different defendants." *Id*. at 416 n.13.

Those same principals defeat Plaintiff's access to the courts claims against Floyd County. Plaintiff makes clear that the remedy seeks in his access to courts

claim is money damages. [Doc. 44 at 20]. This remedy is the same as what he seeks in his remaining *Monell* claims, through which Plaintiff can still pursue monetary relief against Floyd County. Accordingly, the Court dismisses Plaintiff's access to courts claim against Floyd County.

### B. Defendant Francis "Jay" Jarvis

#### 1. Claim for Fourteenth Amendment Violations – Concealment of Exculpatory Evidence Brady Claim

Next, Plaintiff asserts a Fourteenth Amendment concealment of exculpatory evidence claim against Defendant Francis "Jay" Jarvis. [Doc. 1 at 40]. Plaintiff claims that Jarvis "intentionally and in bad faith concealed" the fact "[t]hat the weapon that killed Isaac Dawkins was not the same weapon . . . used to kill the dog found at Dawkins's gravesite[.]"[*Id.* at 41–42]. Plaintiff alleges that these actions "deprived Plaintiff of his clearly established constitutional right of due process of law and fair criminal proceedings by failing to disclose exculpatory and impeachment evidence to the DA[.]" [*Id.* at 41].

Section 1983 provides a cause of action for damages against every person who, acting under the color of state law, deprives another of "rights, privileges, or immunities, secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. The statute "is not itself a source of substantive rights" and instead provides a "method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

When a court considers a § 1983 claim, it must first "identify the specific constitutional right allegedly infringed" and then determine the validity of the claim by reference to the specific constitutional standard which governs that right. *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

Under *Brady*, and its progeny, law enforcement officers have a constitutional duty to disclose exculpatory and impeachment evidence to prosecutors, who then must disclose that information to defendants. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Eleventh Circuit first recognized that a Brady claim is cognizable under § 1983 in *McMillian*, 88 F.3d at 1567 n.12. *See also Porter v. White*, 483 F.3d 1294, 1304 (11th Cir. 2007) (holding that "§ 1983 provides a cause of action for a violation of the due process right to a fair trial that is protected by *Brady*.") (quoting *McMillian v. Johnson*, 88 F.3d 1554, 1569 n.12 (11th Cir. 1996)). There, the Eleventh Circuit held that if officials "*intentionally* withhold exculpatory or impeachment evidence from the prosecutor[,]" they violate a clearly established law. *Id.* at 1569 (emphasis added). However, "the [*McMillian*] opinion did not address whether less-than-intentional conduct on the part of a police officer would violate the duty." *Porter*, 483 F.3d at 1306. While *Brady* rights attach "irrespective of good faith or bad faith of the prosecution[,]" "the no-fault standard of care *Brady* imposes . . . in the criminal or habeas context has no place in a § 1983 damages action against a law enforcement official in which the plaintiff alleges a violation of due process." *Id.* at 1305–06.

24

Therefore, to have a viable cause of action, Plaintiff cannot allege "mere negligence or inadvertence on the part of the law enforcement official in failing to turn over *Brady* material to the prosecution." *Id*. at 1308. Instead, Plaintiff must establish *intentional* conduct on the part of Jarvis to be successful in this claim against him, because the Eleventh Circuit, in *Porter*, declined to "consider whether . . . something less than intentional conduct such as recklessness or gross negligence is enough to trigger the protections of the Due Process Clause." *Id*. at 1308 n.11 (citing *Daniels v. Williams*, 474 U.S. 327, 334 n.3 (1986)).[8]

Further, in *McMillian*, the Eleventh Circuit also held that to allege a valid *Brady* claim under § 1983, "every reasonable official in the position of [the Defendants must] understand that withholding" evidence "would undermine confidence in the outcome" of a plaintiff's trial. *McMillian,* 88 F.3d at 1570. That standard cannot be evaluated "with the benefit of hindsight, knowing what evidence actually was presented at trial," but instead must be evaluated from the viewpoint of the officer at the time who "did not have the benefit of knowing exactly how the totality of the evidence would play out at trial." *Id*. Therefore, Plaintiff must plead facts that show Jarvis intentionally withheld what he knew to be *Brady* material,

---

[8] To date, there is no binding precedent that clearly establishes that a defendant can be held liable for anything less than intentional misconduct under such claims.

because that was a clearly established right at the time for *Brady* claims to be brought under § 1983.

Plaintiff contends that "Jarvis personally transported the exculpatory .22 bullet from the GBI Crime Lab to the courthouse." [Doc. 1 ¶ 128]. Further, he alleges that "DA Colston was unaware of this fact, or that the GBI had determined the caliber of the bullet." [*Id.*]. However, this allegation does not show that Jarvis knew about the difference in caliber between the two bullets, which is the *Brady* evidence that Plaintiff alleges that Jarvis withheld. To be successful in his claim, Plaintiff must show that Jarvis knew of the exculpatory nature of the evidence. Nothing within Plaintiff's complaint allows for the conclusion that Jarvis had *actual knowledge* of the difference between the caliber of the bullets between the dog carcass and Dawkins's murder. At most, Jarvis knew that he was transporting the bullet from the dog carcass from the GBI crime lab to trial, but that is not enough to show that he *knew* that bullet was different from the type of bullet with which Dawkins was shot.

Plaintiff also alleges that "[t]he GBI determined that the bullet from the dog carcass was a .22 caliber. It was not a 9mm, the type of bullet that killed Dawkins." [*Id.* ¶ 124]. Plaintiff asserts that this is enough to show that Jarvis understood, at the time, that the evidence was exculpatory. However, the fact that someone at the GBI discovered this information, and not Jarvis specifically, does not save Plaintiff's claim. Section 1983 typically does not typically allow for vicarious liability. *See*

26

*Iqbal*, 556 U.S. at 676 (holding that "vicarious liability" was "inapplicable" to a § 1983 suit and therefore "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). Without proof that Jarvis himself was the one who discovered the exculpatory nature (or even an allegation that he did) or that someone informed Jarvis of the exculpatory nature of the evidence, Plaintiff's allegation that someone from the GBI determined the caliber difference does not allege enough to hold Jarvis liable.

Plaintiff also does not adequately allege that Jarvis himself intentionally concealed the exculpatory information with the understanding that withholding that evidence would impact Plaintiff's trial. Plaintiff's complaint contains no allegations that Jarvis had knowledge of the allegedly false information provided "by FCPD investigators" to the prosecutor about Dawkins's dog. Nor does Plaintiff allege that Jarvis had knowledge of the connection between the Dawkins's deceased dog, Dawkins's murder, and the dog carcass found at the grave. Because the Court must consider Plaintiff's allegations without the benefit of hindsight, Plaintiff's *Brady* claim against Jarvis based on the evidence the DA presented at trial fails to state a claim against Jarvis.

Plaintiff's only allegation relating Jarvis to the dog carcass bullet is that Jarvis transported the bullet to the courthouse for Plaintiff's trial. [Doc. 1 ¶ 128]. However,

still, Plaintiff does not allege that Jarvis examined the bullet or understood its exculpatory significance. The fact that Jarvis transported the bullet does not state a claim that he intentionally withheld the information from the DA. In fact, Jarvis bringing the bullet to the courthouse could reasonably lead to a conclusion that Jarvis did not intend to withhold that evidence from the DA. Rather, it indicates he intended to give the bullet to the DA. While this behavior may indicate that Jarvis knew the bullet was important, Plaintiff does not allege enough to support a finding that Jarvis knew the exculpatory nature of the evidence and hid that from the DA. Finding so would require far too many speculative jumps. For Plaintiff's claim to be successful, he must allege "enough to raise a right of relief above the speculative level." *Watts*, 495 F.3d at 1295 (citing *Twombly*, 550 U.S. at 544); *see also Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012) ("Factual allegations that are 'merely consistent with a defendant's liability' fall short of being facially plausible.") (citing *Iqbal*, 556 U.S. at 678). Plaintiff's allegations only raise the mere possibility of misconduct, but not enough to survive this motion. Plaintiff, at most, can state a claim for negligence which, as stated, is not enough for § 1983 liability. Accordingly, Plaintiff's *Brady* claim against Jarvis is dismissed without prejudice.[9]

---

[9] As the Court noted at hearing on September 24, 2025, the Court dismisses this claim without prejudice to allow Plaintiff to conduct discovery. [Doc. 73 at 127]. Then, if Plaintiff "can find facts to support [his] assumptions, then [he] can file a motion to add them back as a party." [*Id*. at 127 –28].

### 2. Claim for Suppression of Exculpatory Evidence and Deprivation of Effective Access to Courts in Violation of the First and Fourteenth Amendment

Plaintiff claims that "Defendants deprived Plaintiff of his constitutional right to due process of law and meaningful access to courts by concealing from the District Attorney and those acting on his behalf evidence that demonstrated his innocence and the wrongfulness of his conviction." [Doc. 1 ¶ 231]. Plaintiff claims that "it was Jarvis who initially concealed the evidence related to the caliber of the bullet removed from the dog" and that "whoever was subsequently assigned the task  of producing the  documents requested was unable to find the exculpatory evidence related to the bullet." [Doc. 48 at 17].

As laid out in more detail in the section above related to this claim against Floyd County, to state a claim for violation of his right to access to courts, a plaintiff must show that jail officials "frustrated or impeded [his] efforts to pursue a nonfrivolous legal claim," which "must be an appeal from a conviction for which [he] was incarcerated, a habeas petition, or a civil rights action." *Bass*, 143 F.3d at 1445; *Harbury*, 536 U.S. at 413. "[T]he right [of access] is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court." *Id*. at 415. Accordingly, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation." *Id*.

As with Plaintiff's claim against Floyd County for the same cause of action, Plaintiff's access to courts claim and his *Brady* claim are based on the same alleged Brady material and seek damages for the same injury—his wrongful imprisonment based on the alleged concealment of the exculpatory information. Therefore, Plaintiff's access to courts claim is duplicative of his *Brady* claim, both seek money damages for the same alleged harm.

However, unlike Floyd County, the Court has dismissed Plaintiff's other claims against Jarvis. Therefore, this access to courts claim is the only claim still pending against Jarvis. Plaintiff does not allege that Jarvis had any responsibility to produce any documents to him after he was convicted. As for Plaintiff's claim that Jarvis potentially concealed the evidence so that subsequent individuals could not locate it, the complaint does not allege enough to show that it was Jarvis who initially concealed the evidence related to the caliber of the bullet removed from the dog, as Plaintiff contends. Plaintiff fails to claim that Jarvis committed a pretrial *Brady* violation for the same reasons he fails to allege a posttrial claim to relief. Therefore, Plaintiff's claim against Jarvis for access to courts is dismissed without prejudice.

### C. Defendant James R. Garmon's Motion to Dismiss

#### 1. Claim for Fourteenth Amendment Violations – Concealment of Exculpatory Evidence Brady Claim

Plaintiff also asserts Fourteenth Amendment concealment of exculpatory evidence claims against Defendant James R. Garmon. [Doc. 1 at 40]. Plaintiff asserts

that Garmon concealed two different pieces of evidence: (1) evidence related to the cell phone investigation; and (2) evidence related to the dog carcass bullet. [*Id*. ¶¶ 52, 78, 124–25]. Plaintiff alleges that these actions "deprived Plaintiff of his clearly established constitutional right to due process of law and fair criminal proceedings by failing to disclose exculpatory and impeachment evidence to the DA[.]" [*Id*. at 41].[10]

### a. Cell Phone Investigation Evidence

First, Plaintiff's complaint alleges that Garmon "intentionally and in bad faith concealed all evidence related to the investigation Moser and the FCPD did on the highway seeking cell tower information." [*Id*. ¶ 184]. This allegation partially stems from the fact that Plaintiff claims that Garmon was aware of these drives by pointing to a note Garmon wrote. However, there is no evidence or allegation that Garmon was aware of the results of the FCPD test drives. Garmon's note indicates the opposite, that he was unaware of the results. Specifically, the note reads:

> Investigator Sutton stated that Captain Tommy Shiflett of the Floyd County Police Department, using a cellular phone, had made several test calls starting at the residence of Joey Watkins, and traveling to the crime scene where Isaac Dawkins was shot. Investigator Sutton stated that the calls were linked to several different cellular towers in the Rome/Floyd County area, some overlapping, and would furnish a copy of his report upon receipt.

---

[10] Since the claims against Garmon are the same as against Jarvis, the Court applies the same legal standards to Garmon as it did to the claims regarding Jarvis. *See* Section III. (B)(1).

[*Id.* ¶ 81]. This note does not indicate that Garmon had received results or even knew of the results of these drives. Plaintiff states that this note was not turned over to the prosecution and "[t]herefore, the evidence that this investigation into the cell towers and distances between relevant locations was even conducted was concealed from Watkins's attorneys." [*Id.* ¶ 82]. However, the note has no conclusions and by itself, does not indicate what the results were, if Garmon was ever aware of the results, or if those results were exculpatory. As the Court stated at the hearing on September 24, 2025, this note "doesn't say that [Garmon] possessed this information firsthand because he did it, just that somebody did something?" [Doc. 73 at 47]. That is all this note indicates, and Plaintiff's allegations based on this note fail.

Beyond the note, Plaintiff alleges that Garmon concealed FCPD investigations. Plaintiff alleges that "Sutton provided the results of the [test drive] investigation to [Garmon]." [*Id.* ¶¶ 52, 78]. This information is conclusory because there is no evidence that Garmon received results, how the results were exchanged, why they were exchanged, and when they were exchanged. Even if Garmon did have the reports, there are no allegations that Garmon acted in bad faith, as required for a § 1983 *Brady* claim. There are no allegations of how Garmon acted in bad faith.

Plaintiff's claim against Garmon for concealing exculpatory evidence related to the cell phone data fails and is dismissed without prejudice. [11]

### b. Dog Carcass Bullet Evidence

As Plaintiff alleged against Jarvis, Plaintiff also alleges that Garmon withheld exculpatory evidence related to the bullet found in the dog carcass. [Doc. 1 at 40]. Plaintiff claims that Garmon "intentionally and in bad faith concealed" the fact "[t]hat the weapon that killed Isaac Dawkins was not the same weapon . . . used to kill the dog found at Dawkins's gravesite[.]"[*Id*. at 41–42]. Plaintiff alleges that these actions "deprived Plaintiff of his clearly established constitutional right of due process of law and fair criminal proceedings by failing to disclose exculpatory and impeachment evidence to the DA[.]" [*Id*. at 41].

Plaintiff fails to allege a valid *Brady* claim against Garmon based on the dog carcass bullet evidence because the only allegations related to Garmon are that he was assisting in the investigation. Nowhere does the complaint state that Garmon supervised either Jarvis or the person who inspected the dog carcass and the bullet. Plaintiff makes no claim that Garmon was personally involved in, had knowledge of, or knew whether the file on the dog carcass and bullet was requested or provided.

---

[11] Just as the Court did with Jarvis above and as the Court noted at hearing on September 24, 2025, the Court dismisses this claim without prejudice to allow Plaintiff to conduct discovery. [Doc. 73 at 127]. Then, if Plaintiff "can find facts to support [his] assumptions, then [he] can file a motion to add them back as a party." [*Id*. at 127–28].

Accordingly, Plaintiff's claims against Garmon for concealment of exculpatory evidence is dismissed without prejudice.

## 2. Access to Courts Claim

Finally, Plaintiff claims that "Defendants deprived Plaintiff of his constitutional right to due process of law and meaningful access to courts by concealing from the District Attorney and those acting on his behalf evidence that demonstrated his innocence and the wrongfulness of his conviction." [Doc. 1 ¶ 231]. To support his access to courts claim against Garmon, Plaintiff cites the following allegations: "Garmon was assigned to coordinate and supervise the GBI's involvement in the investigation" [*Id*. ¶ 52], that "Sutton provided the results of [the cell tower investigation] to" Garmon [*Id*. ¶ 78], and that Garmon "intentionally and/or recklessly concealed this evidence from the DA's Office" [*Id*. ¶ 79]. Additionally, Plaintiff points to Garmon's notes and alleges bad faith on the part of Garmon to support his claim. [*Id*. ¶¶ 81, 83].

As laid out in more detail in the section above related to this claim against Floyd County and against Jarvis, to state a claim for violation of his right to access to courts, a plaintiff must show that jail officials "frustrated or impeded [his] efforts to pursue a nonfrivolous legal claim," which "must be an appeal from a conviction for which [he] was incarcerated, a habeas petition, or a civil rights action." *Bass*, 143 F.3d at 1445; *Harbury*, 536 U.S. at 413.

As with Plaintiff's claims against Floyd County and Jarvis for the same cause of action, Plaintiff's access to courts claim and his *Brady* claim are based on the same alleged Brady material and seek damages for the same injury—his wrongful imprisonment based on the alleged concealment of the exculpatory information. Plaintiff's access to courts claim is duplicative of his *Brady* claim, both seek money damages for the same thing.

However, unlike Floyd County (but like Jarvis), Plaintiff's claims against Garmon are being dismissed. Still, Plaintiff's access to courts claim is also due to be dismissed for the same reasons that his *Brady* claims do not survive this motion. As laid out in greater detail above, Plaintiff does not allege enough to show that Garmon did anything to participate in the acts that Plaintiff based his access to courts claim on. All allegations against Garmon that Plaintiff puts forth are conclusory and do not survive this motion to dismiss.

## IV.    CONCLUSION

Accordingly, Defendant Floyd County, Georgia's Motion to Dismiss [Doc. 34] is **DENIED** as to Count IV, but **GRANTED** as to Count V. Defendant Francis Jarvis's Motion to Dismiss [Doc. 40] and Defendant James R. Garmon's Motion to Dismiss [Doc. 42] are **GRANTED**. Therefore, the Court **DISMISSES WITHOUT PREJUDICE** Defendants Franics Jarvis and James R. Garmon.

**IT IS SO ORDERED** this 22nd day of January, 2026.

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE

35